E. Cody LAIRD and Joanne H. Laird, Plaintiffs-Appellants Cross-Appellees,

v.

UNITED STATES of America, Defendant-Appellee Cross-Appellant.

No. 75–2113.

United States Court of Appeals, Fifth Circuit.

Aug. 4, 1977.

Harold E. Abrams, A. Stephens Clay, Emmet J. Bondurant, Atlanta, Ga., for plaintiffs-appellants cross-appellees.

John W. Stokes, Jr., U. S. Atty., William D. Mallard, Jr., Asst. U. S. Atty., Atlanta, Ga., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Alfred S. Lombardi, Atty., Gilbert E. Andrews, Acting Chief, Appellate Section, Dept. of Justice, Washington, D. C., for defendant-appellee cross-appellant.

Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON *, District Judge.

AINSWORTH, Circuit Judge:

This suit for refund of federal income taxes involves the tax treatment of the purchase of the Atlanta Falcons professional football team franchise and the assets necessary to establish, field and operate the team. It arises out of the 1966 agreement between The Five Smiths, Inc. (Five Smiths) and the National Football League (NFL) in which, for $8.5 million, Five Smiths bought an NFL professional football franchise for Atlanta, together with the contracts for the services of forty-two veteran football players and other intangible assets.[1]

The questions before us involve the amortization of intangible assets under the Internal Revenue Code by the purchaser. Three issues are presented: (1) whether intangible assets acquired by Five Smiths in this transaction are subject to an allowance for depreciation under 26 U.S.C. § 167(a), where such assets were purchased in a bundle of interrelated intangibles; (2) whether the purchaser is entitled to amortize, and thus to claim a depreciation deduction for its right to share ratably in the revenues produced by a four-year contract between the NFL teams and the CBS Television Network for the televising of NFL games; and (3) assuming the purchaser is entitled to an allowance for depreciation of the players' contracts which it received in the 1966 deal, whether the district court's valuation of those contracts was correct.

We hold that the depreciation allowance applicable to intangible assets is not lost when such assets are purchased in a bundle of interrelated assets. Furthermore, we hold that, though the purchaser is not entitled to an amortization deduction for its rights in the television contract with CBS, the purchaser is entitled to amortize the value of the players' contracts in the amount determined by the district court. The decision of the district court is affirmed, but for reasons which differ somewhat from those expressed by the trial judge.

---

* Senior District Judge of the District of Montana, sitting by designation.

1. Pursuant to the court's request at oral argument, the United States made inquiry of the Internal Revenue Service and learned that there are pending similar tax cases, in addition to that of the Atlanta Falcons, involving the issue of sport franchises. The other matters are concerned with the Kansas City Royals (baseball), the Miami Dolphins (football), the Seattle Supersonics (basketball), the Philadelphia Flyers (hockey), and the Kansas City Athletics (baseball).

## I.

### A. Preliminary Statement of the Case.

Five Smiths paid the NFL and its member teams $8,500,000.02 for the franchise and the other assets acquired in the transaction. Five Smiths, a Georgia corporation set up to operate the professional football team in Atlanta, elected to be taxed in the taxable years involved as a Sub-chapter S small business corporation, pursuant to 26 U.S.C. §§ 1371–79, for its taxable years ending January 31, 1967 and January 31, 1968. Therefore, the corporation's tax consequences were passed on to the individual shareholders. Rankin M. Smith is the owner of 64% of the shares of Five Smiths, and plaintiff taxpayer E. Cody Laird, Jr. owns 6% of the common stock.[2] On its tax returns for the taxable years ending January 31, 1967 and January 31, 1968, the years involved in this case, Five Smiths applied the purchase price of $8.5 million in the following manner: $727,086 was deducted from the purchase price as deferred interest, $50,000 was set up as the nondepreciable cost of the NFL franchise, and the remaining $7,722,914.04 was shown as the cost of the players' contracts, with estimated useful life of 5.25 years. Accordingly, amortization deductions of $1,471,031.24 for the players' contracts were taken by the corporation in each of the two tax years involved.

The corporation reported losses of $506,329 in 1967 and $581,047 in 1968, and plaintiffs, accordingly, reported on their personal income tax returns their proportionate share of the corporation's losses, $30,380 for 1967 and $34,638 for 1968.

The Internal Revenue Service (IRS) accepted Five Smiths' treatment of the $50,000 cost of the franchise and the $727,086 deferred interest deduction, but determined that only $1,050,000 should be allocated to the depreciable asset "player contracts and options," amortized over the 5.25-year useful life. The remaining $6,722,914 of the purchase price was allocated by the IRS to the nondepreciable cost of the franchise. Therefore, the $1,471,031.24 depreciation deductions claimed by Five Smiths in each of the tax years were disallowed to the extent of $1,271,031.24. As a consequence thereof, Five Smiths was shown to have taxable income rather than loss for the years in question, and plaintiffs Lairds' proportionate share of the corporation's claimed losses was disallowed. This resulted in the underpayment by plaintiffs of $48,218.99 for the taxable years 1967 and 1968 which is the amount sought in this refund suit, the tax deficiency having been first paid.

### B. The Pertinent Facts.

Five Smiths' entry into the game came at a time of competition and expansion in professional football. The NFL and its rival, the American Football League, were competing for available talent during the mid-1960's and, as the district court pointed out, the so-called "war" between the leagues drove up the cost to team owners of players and other assets. In 1965, both leagues were interested in expanding their respective organizations by selling a new team franchise for operation in Atlanta by 1966. Both contacted potential franchise owners, one of whom—approached by the NFL—was Rankin M. Smith, the successful majority-interest purchaser herein. At that time, entrance into the NFL required the approval of twelve of the (then) fourteen member clubs, and an agreement to be bound by League rules and regulations, to pay all League assessments, and to pay a $50,000 membership fee.

A June 29, 1965 letter of understanding from NFL Commissioner Pete Rozelle to Rankin M. Smith,[3] which was designated as

---

**2.** Laird's wife, Joanne, the other plaintiff in this action, filed joint tax returns with her husband for the years in question.

**3.** Following is the text in full of the letter:

29 June 1965

Mr. Rankin M. Smith
Life Insurance Company of Georgia
573 West Peachtree Street, N.E.
Atlanta, Georgia 30308

Dear Mr. Smith:

This shall confirm the understanding between the National Football League (hereinafter referred to as "National") and Rankin M. Smith (hereinafter referred to as "Smith") to the effect that National has granted a franchise in said league to Smith to be operated in Atlanta, Georgia, commencing with the 1966 football season subject to the following terms and conditions:

1. Smith agrees to pay the sum of fifty thousand dollars ($50,000) for said franchise; $25,-

a binding memorandum agreement, included, importantly, the essential elements of the deal, as follows:

1. The League granted Rankin M. Smith an NFL franchise in Atlanta, commencing with the 1966 football season, for which Smith was to pay $50,000;[4]

2. Smith agreed to pay the NFL member clubs $8,450,000 over five years for the purchase of players owned by those teams. After the 1965 season, each member club would sell Atlanta three of that club's veteran players who were under contract and

000 of said amount shall be paid on or before July 10, 1965, and the balance upon the obtaining of a satisfactory lease on the Atlanta stadium as herein set out.

2. Smith further agrees to pay to the member clubs of National the sum of $8,450,000 for the purchase of players owned by the member clubs of National to be assigned and transferred to Smith as hereinafter set out. Said sum of $8,450,000 shall be paid to the Commissioner of National as trustee for the member clubs in the following manner: 25% on but not before August 15, 1966, and the balance in four equal annual installments on the 15th day of each August thereafter until fully paid.

3. Each member club shall sell Atlanta following the close of the 1965 season three veteran members of its active list then under contract. The identity of such players and the method of selection shall be pursuant to a formula hereafter adopted by the member clubs at the 1966 annual meeting of National. Under such formula each club may withhold a fixed number of players free from selection and shall make the balance of its active list available for selection to Smith. Smith shall not be entitled to select more than three players per club.

4. This agreement by Smith is contingent upon Smith being able to obtain a satisfactory lease for the use of the Atlanta stadium permitting Smith to operate a National Football League franchise in Atlanta and to use said stadium upon terms satisfactory to Smith for a minimum period of ten years commencing in 1966; such lease to be awarded on or before the 6th day of July 1965.

5. When the lease shall have been acquired and Smith admitted as a member of National, Smith shall receive the following:

A. A franchise for Atlanta in National.

B. Smith shall be entitled to participate in the 1965 selection meeting of National and shall be awarded the first choice in the first twenty rounds thereof and an extra choice at the end of each of the first five rounds.

C. Smith shall receive one-fifteenth of any sum paid by any network for any single

were on the club's active list. The letter agreement provided that the selection of those players, in what ultimately was to be the so-called "expansion draft," would take place according to a formula to be subsequently developed by the member clubs;

3. Smith was to have the right to participate in the 1965 college draft and to have a large number of preferential draft choices therein;

4. Smith was to receive "one-fifteenth of any sum paid by any network for any

network television contract commencing in 1966 and a pro rata share each year thereafter while Atlanta holds a franchise.

6. The selection of management and coaches shall be subject to the prior approval of the Commissioner of National. Similarly, any other persons other than Smith who shall own a share in said club shall be subject to approval by the member clubs of National. In no event shall Smith personally own less than fifty-one percent of said franchise.

7. In addition thereto Smith shall personally guarantee all financial obligations hereinabove set out.

8. If a sixteenth franchise is granted, Smith shall not participate in any share of any monies paid for such new franchise granted by National.

9. The entity to operate the franchise and the persons owning any interest therein shall be subject to and bound by the Constitution and By-Laws of the National Football League.

This letter shall constitute a memorandum agreement and be binding upon National and Smith. Upon its execution and upon the procurement of a lease on the stadium hereinabove referred to, a more formal document shall be prepared and executed setting forth in detail the terms thereof.

If this letter meets with your approval, kindly affix your signature on a duplicate copy thereof at the place indicated and the same shall constitute a binding agreement between us.

Very truly yours,
THE      NATIONAL      FOOTBALL
  LEAGUE
(s) BY: _Pete Rozelle_
          Pete Rozelle, Commissioner
I have read the foregoing, consent thereto, and agree to be bound thereby.
(s) _Rankin M. Smith_
      Rankin M. Smith

4. The NFL Constitution and By-Laws applicable during 1966 established a price of $50,000 for an NFL franchise.

single network television contract commencing in 1966 and a pro rata share each year thereafter while Atlanta holds a franchise."

Five Smiths was incorporated in August 1965. The new corporation participated in the college draft for rookie players that November, and was granted draft-choice privileges. On February 14, 1966, after Five Smiths had obtained a lease on the Atlanta stadium, the member teams of the NFL authorized Commissioner Rozelle to execute a formal agreement with Five Smiths for the consummation of the Atlanta deal. The member teams and Five Smiths also reached agreement on a formula for the expansion draft, in which Atlanta was to acquire the forty-two veteran players from the other teams.[5] Those players who were so acquired had a total of 149 years of prior NFL experience. At the start of the 1966 season, twenty-five of them were on Atlanta's active roster, and all of those played at least occasionally during the season.[6]

The television rights acquired under the February 14, 1966 agreement specified in article VIII, paragraph (f), in terms similar to the previously-quoted provision of the June 29, 1965 letter of understanding, that Smith would participate equally with the other NFL clubs in "any Single Network television contract(s) hereafter executed by the League for the year 1966 and thereafter during the time the Atlanta Club continues as a member of the League." This provision must be considered in the context in which it was written. Television rights were owned by the member teams individually, rather than by the League; however, pursuant to a partial statutory exemption for professional sports leagues from the an-

titrust laws,[7] which exemption pertains to the telecasting of games, the member teams in the NFL bargained collectively for the sale of television rights. In December 1965, Commissioner Rozelle agreed to a television contract with the CBS Television Network, pursuant to which CBS received the right to televise NFL games during the years 1966 through 1969 and, in exchange, agreed to pay the NFL's members the following total amounts for all teams during the four-year term of the contract:

| Year | Amount |
|------|--------|
| 1966 | $ 18,800,000 |
| 1967 | 20,050,000 |
| 1968 | 20,300,000 |
| 1969 | 20,050,000 |

Television revenues were an important element of team income for all clubs, and were crucial to Five Smiths. Before the June 29, 1965 letter of understanding was even executed, counsel for Rankin M. Smith had been told that a contract was being negotiated under which Five Smiths could reasonably expect to receive about $1,000,000 annually in such revenues. According to counsel's testimony, Smith would not have proceeded with the deal if he had not been assured of the TV income. The contract which Commissioner Rozelle negotiated with CBS satisfied those expectations. The district court found that the minimum amount of income Five Smiths could reasonably have expected to receive from the four-year CBS contract was as follows:

| Year | | Amount |
|------|------|--------|
| 1966 | | $ 1,248,000 |
| 1967 | | 1,220,000 |
| 1968 | | 1,142,500 |
| 1969 | | 1,126,875 |
| | Total | $ 4,737,875 |

---

5. Under the expansion draft, each team made players available who were under contract to the selling team and were on that team's active or injured reserve lists. The formula in the February 14 agreement enabled the selling teams to "freeze," or protect, certain of their players, and Five Smiths to select three players from each selling team's remaining pool of players.

6. Before entering the expansion draft, five Smiths also signed contracts with approximate-

ly fifty other players, who were either free agents or were rookies acquired in the college draft.

7. 15 U.S.C. § 1291; see S.Rep.No.1087, 1961 U.S.Code Cong. & Admin.News p. 3042 (1961). The statute provides in pertinent part that the antitrust laws shall not apply to any joint agreement by which a league of professional sports clubs sells its member clubs' rights in the telecasting of their games.

The nature and valuation of the various additional assets purchased by Five Smiths is discussed in greater detail below.

Five Smiths named its club the "Atlanta Falcons," and, as expected, the team began playing football in the NFL in the 1966 season.

## II.

### *The Issues Restated*

In the lower court, plaintiff taxpayer E. Cody Laird contended at the outset that either (1) the amount of the purchase price allocable to the players' contracts was $7,722,914.02,[8] to be amortized by Five Smiths over a 5.25-year useful life, or (2) in the alternative, Five Smiths' right to receive television revenues under the February 14, 1966 agreement had a fair market value of approximately $4.3 million and a useful life of four years and thus this right was also a depreciable asset. The district court, rejecting both contentions, held that the television rights under the four-year contract with CBS had a present value of $4,277,043.[9] However, construing the February 14, 1966 agreement between the NFL, the NFL member teams and Five Smiths, the district court found that Five

Smiths had also acquired rights to share ratably in a League television pool, which rights would last as long as the Atlanta club remained a member of the League, and that it was impossible therefore to ascertain a definite limited useful life of those rights. Accordingly, the court held that no depreciation deduction could be taken for the acquired television rights. Employing what was essentially a subtraction method of allocation, the district court also held that, after subtracting the present value of the television rights pursuant to the CBS contract from $7,722,914.02,[10] the total amount of the purchase price which remained after deducting interest and the membership fee, there remained only $3,445,871.02 to be allocated to the remaining assets. With regard to the players' contracts, the court ultimately adopted a compromise valuation, substantially as submitted by plaintiffs, of $3,035,000, and held that Five Smiths was entitled to claim depreciation deductions for the players' contracts, based upon that valuation and a useful life of 5.25 years. There thus remained of the total purchase price only the sum of $410,871.02, which was allocated to the cost of the franchise. The district court's allocation, in summary, was as follows:

| | | | |
|---|---|---|---|
| TOTAL CONSIDERATION PAID BY FIVE SMITHS | | | $8,500,000.02 |
| MINUS: | Items not in dispute | | |
| | (a) Membership Fee | $ 50,000.00 | |
| | (b) Interest | + $ 727,086.00 | |
| | | $ 777,086.00 | –$ 777,086.00 |
| EQUALS: | Total Amount in Dispute | | $7,722,914.02 |
| MINUS: | Minimum Present Value of Television Rights | $4,277,043.00 | –$4,277,043.00 |
| EQUALS: | Remainder of Purchase Price Available for Allocation to Remaining Assets Acquired | | $3,445,871.02 |
| MINUS: | Amount Allocated to Player Contracts | $3,035,000.00 | –$3,035,000.00 |
| EQUALS: | Remainder to Be Allocated to the Franchise | | $ 410,871.02 |

8. This figure represents the total consideration paid by Five Smiths of $8,500,000.02, minus the items not in dispute, namely, the $50,000 membership fee and $727,086 in interest.

9. This figure represents the application of a discount rate of 5% to $4,737,375, the total value of the payments which the district court found Five Smiths could reasonably expect to receive under the contract.

10. *See* note 8 *supra.*

Taxpayers have appealed from the judgment of the district court and the Government has cross-appealed. On appeal taxpayers contest the denial of a depreciation allowance for the television rights. They contend that Five Smiths is entitled to amortize the $4,277,043 present value, ascertained by the district court, of the company's television rights pursuant to the four-year contract with CBS. The Government's appeal contends that Five Smiths purchased a bundle of intangible assets whose values were so interrelated that it is impossible to allocate values to any of the individual assets except in an arbitrary fashion. Under this argument, the taxpayers are not entitled to any depreciation deduction. In the alternative, the Government contends that, assuming the total purchase price is capable of allocation among the various assets, the amount allocated to the players' contracts by the district court is not supported by the evidence.

### III.

#### The Depreciation of Intangibles, in General

The Internal Revenue Code allows a reasonable depreciation deduction for the "exhaustion, wear and tear" of property used in the taxpayer's trade or business. I.R.C. § 167(a)(1). "The property, to be depreciable, must be an inherently wasting asset, but this allowance is not limited to tangible assets." *Griswold v. Commissioner of Internal Revenue*, 5 Cir., 1968, 400 F.2d 427, 433, *quoted in Houston Chronicle Publishing Co. v. United States*, 5 Cir., 1973, 481 F.2d 1240, 1245, *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974). The deduction is also available to certain types of intangibles. The Treasury Regulations explicitly provide:

> If an intangible asset is known from experience or other factors to be of use in

the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to good will.

Treas.Reg. § 1.167(a)–3.

■ Contract rights may qualify for the deduction. *See* 4 Mertens, Law of Federal Income Taxation § 23.64, at 228–33 (rev. ed. 1973). For example, contracts for personal services have been held to be amortizable assets, *see KFOX, Inc. v. United States*, Ct.Cl., 1975, 510 F.2d 1365, 1378, as have contracts to receive royalties, *see Barnes v. Commissioner*, 8 BTA 360 (1927); Mertens, *supra*, § 23.69, at 252. Indeed, under a 1971 Revenue Ruling, the cost of a standard football player contract owned or controlled by a professional football team must be capitalized and amortized over its useful life. Rev.Rul. 71–137, 1971–1 C.B. 104; *cf.* Rev.Rul. 67–379, 1967–2 C.B. 127 (baseball player contract).[11]

### IV.

#### The Government's Bundle-of-Rights Theory

At the outset, we consider the Government's theory that Five Smiths purchased a bundle of inextricably intertwined assets whose values are so interrelated that they are not capable of separate valuation and, thus, are not eligible for the depreciation deduction. This theory, if correct and ap-

---

11. As the district court pointed out, Rev.Rul. 71–137 was not in existence at the time of the acquisition in this case. However, Rev.Rul. 54–441, 1954–2 Cum.Bull. 101, *revoked by 67–*

379, 1967–2 C.B. 127, was in effect during the period in dispute and supports the depreciation of the players' contracts at bar.

plicable to both the players' contracts and the television contract with CBS, would end further inquiry in the case. The Government would prevail completely.

The bundle-of-rights theory is the Government's chief argument. Its thesis, basically a restatement of the so-called "mass asset" rule, is that Five Smiths purchased "a mass asset whose value does not lie in its individual components but rather through the chemical reaction of the entire mass being employed as a whole." [12] In support of its contention, the Government lists a number of rights and intangibles alleged to have been acquired in the deal. The list includes not only those assets in dispute, *viz.*, the television rights and players' contracts, but also the exclusive territorial rights for NFL football within a 75-mile radius of Atlanta; the right to sell programs at home games; the right to participate in the college draft; and the right to share in the NFL's goodwill. [13] The Government then projects various assumed values for some of these assets. When added together, these values total far more than Five Smiths' purchase price. These values are suggested to illustrate the point that valuations cannot be made on an individualized basis in a transaction like the present one, that the assets have value only in relation to one another when they are purchased *en masse*. Thus the rights come into being, and are susceptible to measurement, only in connection with the NFL franchise. The Government further notes that there is no market for the individual assets purchased by Five Smiths because they are never sold individually.

The bundle-of-rights concept is hardly novel. The Government raised essentially the same argument in *Houston Chronicle, supra,* a case involving the amortization of newspaper subscription lists in the context of the purchase by a newspaper publisher of a competing newspaper, where the purchaser did not intend to continue publishing the acquired paper. This court held that subscription lists such as those there at issue could be depreciated for tax purposes, provided the taxpayer-purchaser satisfied a dual burden in establishing its right to claim the deduction.

*Houston Chronicle* rejected a "monolithic 'mass asset' theory," 481 F.2d at 1253, and a *per se* rule of non-amortizability in every case involving the acquisition of both goodwill (or other assets with similar characteristics) and additional intangibles. *Id.* at 1249–50, 1253. A two-fold test, we said, controls a situation similar to the one at bar:

> [T]he "mass asset" rule does not prevent taking an amortization deduction if the taxpayer properly carries his dual burden of proving that the intangible asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy.

---

**12.** Government's original brief at 21–22.

**13.** The complete list set forth by the Government consisted of the following:

(1) The right to be the sole provider of NFL football within a 75-mile radius of Atlanta;
(2) Protection by League rules and regulations from intra-league business competition;
(3) The right to share in the proceeds of future NFL expansion (after 1967);
(4) The right to share equally with other NFL clubs in the revenue from all single network television contracts negotiated on a league-wide basis;
(5) The right to sell broadcast rights for preseason television and for both preseason and regular season radio;
(6) The right to share equally with other clubs in revenue from NFL Properties, Inc. and NFL Films, Inc.;
(7) The right to sell programs and advertising space therein at home games;
(8) The right to participate in the expansion draft, the college draft and the NFL waiver system;
(9) The right to share in the NFL's goodwill; and
(10) The right to a risk-free investment, as a consequence of a buy-back option in the contract between Five Smiths and the NFL.

*Id.* at 1250. *Accord, Richard S. Miller & Sons, Inc. v. United States*, Ct.Cl., 1976, 537 F.2d 446, 452.

■ Under that test, the mass-asset theory does not prevent a deduction in the present case for the players' contracts. First, the contracts had an ascertainable value separate and distinct from the value of the franchise (which thus has the same significance in this case as goodwill had in *Houston Chronicle*).[14] As will be explained more fully below, the valuation figure set by the district judge for the players' contracts was supported by the evidence, and reflected their own particular value, notwithstanding the fact that they were acquired in a bundle of rights and intangibles. Second, the district judge found, and it is not disputed on appeal, that the players' contracts had a limited useful life of 5.25 years.[15] Thus, the requirements of *Houston Chronicle* are met with respect to the players' contracts. If the taxpayers could prove that the television rights also had a limited useful life, the mass-asset rule likewise would not bar a depreciation deduction for those rights. However, on the facts of this case, as will be shown below, taxpayers have not made such a showing.

Our conclusion that the mass-asset rule is inapplicable here finds further support in the decision of the Court of Claims in *KFOX, supra.* That case involved the purchase of an operating radio station in which the buyer acquired a number of assets, including contracts for the services of disc jockeys and the station manager, some tangible assets such as a radio transmission tower, and a transmitter site lease. The Government contended in that case that personal service contracts in dispute were inseparable from goodwill and, therefore, were not amortizable. Declining to follow

such reasoning, the court held that personal service contracts such as those for the radio personalities and station manager "may be divisible from 'goodwill' and other intangibles and be treated separately for tax purposes." *Id.*, 510 F.2d at 1377. Relying on the Revenue Rulings which permit the amortization of professional athletes' contracts, the court held that the service contracts at the station could be amortized over the contracts' lives.

*KFOX* is closely in point. It does not matter, under the reasoning of that case, that the players' contracts herein have economic usefulness only in the context of a professional football team franchise. Obviously, the disc jockeys' and station manager's contracts in *KFOX* were only valuable in the context of a radio station, notwithstanding the fact that, according to the court, they had value independent of their contribution to the value of station KFOX's goodwill and FCC broadcast licenses, and that the service contracts might have had independent value to another station. *See* 510 F.2d at 1375, 1377. Moreover, it was conceded by the Court of Claims that the contracts were "at the heart of the profitability of the taxpayer." *Id.* at 1378. Under *KFOX,* what is apparently important to defeat the applicability of the mass-asset rule is that the contracts "represent independent and uniquely valuable assets to the taxpayer." *Id.* Professional football players' contracts are such assets, the *KFOX* court pointed out:

> Looking at the particular facts of the instant case we see no reason why the contracts of the C & W announcers and the station manager should be dealt with in a manner different from that of athletic contracts. In both cases the contracts represent independent and unique-

---

**14.** In *Houston Chronicle* one of the questions presented to the court was whether the subscription lists at issue were to be treated as goodwill for tax purposes. The court pointed out that in such cases the issue is often whether the particular intangible asset in dispute possesses characteristics similar to goodwill such that the reasons for denying amortization deductions for goodwill are fully applicable. *Id.*, 481 F.2d at 1247-49. Here the franchise is

similar to goodwill in that it has an indefinite useful life and is an asset that will not diminish. Thus, the *Houston Chronicle* analysis is applicable.

**15.** The 5.25-year useful life was accepted by the IRS in an engineering and valuation report, and apparently is not contested by the Government.

ly valuable assets to the taxpayer, ensuring through their non-competition clauses that the individuals under contract will not use their skills with any competing organization. To KFOX, as to the professional ball teams, the performers and their contracts are at the heart of the profitability of the taxpayer. . . . [W]e believe these service contracts are amortizable . . . .

*Id.*

The Government in its brief does not contend that any of the rights or assets in the instant case lack value. Indeed, the Government agrees that they possess "considerable value." [16] The point made by the Government is that any one of the rights or assets has "inherent value . . . only because of its [the asset's] juxtaposition with the other rights or assets." [17] We believe that the concession of value reveals the flaw in the mass-asset theory as applied here.

The Government concedes the soundness of the Revenue Rulings permitting the amortization of the acquisition cost of a professional football player, but maintains, however, that the rulings are inapplicable unless a cost basis can be established. It is contended that under the facts of this case, and the peculiar interrelation among the assets purchased, a proper allocation of the purchase price is impossible. Thus, on the one hand, the Government seems to argue that the assets have no value except when they are viewed together and, on the other, that they do have a certain inherent value when considered separately but that that value is lost when the assets are bundled together.

■ The proposition that the individual assets sought to be amortized have no value except in the context of the entire bundle of rights and assets is at odds with the decisions discussed above. It does not matter for purposes of amortization if individual assets only have economic significance in the context of an integrated transaction involving the sale of a number of assets.

Nor do we agree with the Government that there is no market for the players' contracts. There is a market in the industry for veteran football players as shown by the existence of the waiver system and the fact that veteran players are regularly exchanged for other veterans or for draft choices even if such transactions do not ordinarily involve purchases for cash.

The Government fares no better with its contention of impossibility of allocation of value. That the assets contribute value to one another does not prevent their severability for tax purposes. *See Meredith Broadcasting Co. v. United States*, 1968, 405 F.2d 1214, 1224–29, 186 Ct.Cl. 1; *Jack Daniel Distillery v. United States*, 1967, 379 F.2d 569, 576, 180 Ct.Cl. 308. This is so even if the assets are worthless without one another. *See Meredith Broadcasting, supra.* Indeed, in a case like this, valuation of the players' contracts should take account of the impact of the franchise on the contracts' value, and vice versa. *See, e. g., Jack Daniel, supra.*

We have noted already the attempt by the Government to itemize each right acquired in the deal and to value separately each such right for the sake of demonstrating the error in the district court's valuation findings. As earlier stated, the Government's analysis concludes that the individual assets purchased could well be worth an amount far in excess of the total purchase price. Hence, the argument goes, the district court must have been in error, if only because of the impossibility of its task. But the Government fails to recognize that the valuation method adopted by the district court apparently took account of the interrelationship among the assets in valuing them. Such reasoning does not require mathematical certainty, nor even explicit calculation. Nor is the task so fraught with difficulty that we would assume its impossibility. We conclude that the Government's

---

16. Government's original brief at 58.

17. *Id.*

mass-asset theory is inapplicable to the present case.[18]

## V.

### The Television Rights

Taxpayers contend that the district court erred in holding that Five Smiths was not entitled to a deduction for the present value of its television rights under the four-year contract with CBS. The district court's denial of the deduction was based upon its finding that Five Smiths' right to share ratably in the League television pool had no definite useful life the duration of which could be ascertained with reasonable accuracy. The district court's conclusion was based on the plain language of the February 14, 1966 Atlanta agreement. Taxpayers disagree with the district court's construction of that agreement. According to them, the Atlanta agreement conveyed to Five Smiths only the television rights under the four-year contract with CBS, and nothing more with regard to television revenues.

It will be recalled that the June 29, 1965 letter of understanding from Commissioner Pete Rozelle to Rankin M. Smith provided:

> Smith shall receive one-fifteenth of any sum paid by any network for any single network television contract commencing in 1966 and a pro rata share each year thereafter while Atlanta holds a franchise.

And the formal February 14, 1966 agreement specified:

> Smith shall be entitled to participate equally with all other member clubs in any Single Network television contract(s) hereafter executed by the League for the year 1966 and thereafter during the time the Atlanta Club continues as a member of the League.

Taxpayers construe these provisions, which are substantially identical, as referring only to the contract with CBS. They argue, with respect to the letter, that "single" and "commencing in 1966" are words of limitation which make it clear that rather than assigning Smith rights to share television revenues in perpetuity, the team owners were conveying only the right to share in the particular contract then being negotiated.

The construction of these provisions of the agreements is, of course, critical because, under section 1.167(a)–3 of the regulations heretofore quoted, an amortization allowance can be had for an intangible asset only if the asset has a limited useful life and the duration of that limited useful life can be ascertained with reasonable accuracy.

■ We agree with the district court that the language in both the letter and the formal agreement clearly shows that Five Smiths' contention is erroneous. It is abundantly clear from these agreements that Five Smiths' television rights were to last as long as the Atlanta Club remains a member of the NFL. The words "during the time the Atlanta Club continues as a member of the League" and "while Atlanta holds a franchise" are not susceptible to any other reasonable construction: they signify a period of indefinite duration. Revenues received under any "single network television contract" refers to income from contracts negotiated on a League-wide basis for all the NFL teams, pursuant to the antitrust exemption which enabled the teams to combine to sell their nationwide broadcast rights, as opposed to those rights which were not subject to the sharing agreement (e. g., a team's right to enter

---

**18.** We have also considered the Government's argument that its position herein is supported by *Sunset Fuel Co. v. United States*, 9 Cir., 1975, 519 F.2d 781. But that case is plainly distinguishable. Moreover, the court found that the accounts in the customer lists there at issue upon which the claimed deduction was based had not been individually valued. Even if this were a case where the individual players' contracts could not be valued individually, which it manifestly is not, the *Sunset Fuel* court expressly pointed out that "inability to establish a cost basis for particular accounts lost does not necessarily prevent a taxpayer from charging a truly wasting 'indivisible asset' off against the income it currently generates, because the taxpayer can show that the mass as a whole has a limited useful life and depreciate it." *Id.* at 784 n.4.

into an individual television contract for that team's preseason games). The use of the word "single" introduces no ambiguity into the agreement. Finally, the word "contract(s)" (emphasis added)—with an "s"—in that agreement can only support a plural construction, especially in light of the fact that the contract with CBS was signed before the final Atlanta agreement.

Taxpayers dispute the district court's finding that there existed a league television pool, involving further rights in addition to those pursuant to the four-year CBS contract. They rely heavily on the assertion that none of the teams was under any obligation to continue with the pooling arrangement after the expiration of the CBS contract, and that each team was free to return at that point to negotiating an individual contract for the televising of its own home games, as had been the practice prior to 1961. This argument is unpersuasive because it ignores, as the Government points out, the fact that the pooling arrangement was, and is, of substantial economic benefit to the NFL teams. The antitrust exemption for professional sports teams was, in fact, intended to enable them to bargain collectively with the networks in order for the teams, especially the weaker NFL clubs, to obtain continuing and larger television incomes for themselves in a group that might not have been possible had they bargained individually. See S.Rep.No.1087, 1961 U.S.Code Cong. & Admin.News p. 3042. The effect of that legislation has been dramatic. In the year before the exemption was granted by Congress, per team television income for NFL clubs was approximately $150,000 a year. The figure topped $1 million per team in 1965, the year before the CBS contract here in contention took effect. Under the new contract, television revenues rose to about $1,250,000 per team the following year. Today they are substantially higher. The following chart shows the growth pattern for that income: [19]

| Year | Total Contract Price | Per Team |
|------|---------------------|----------|
| 1962 | $ 4,650,000 | $ 332,143 |
| 1963 | 4,650,000 | 332,143 |
| 1964 | 14,100,000 | 1,007,143 |
| 1965 | 14,100,000 | 1,007,143 |
| 1966 | 18,800,000 | 1,248,000 |
| 1967 | 20,050,000 | 1,223,125 |
| 1968 | 20,300,000 | 1,238,750 |
| 1969 | 20,050,000 | 1,223,125 |
| 1970 | 18,000,000 | 1,384,615 |
| 1971 | 18,000,000 | 1,384,615 |
| 1972 | 18,000,000 | 1,384,615 |
| 1973 | 19,000,000 | 1,461,538 |
| 1974 | 20,500,000 | 1,576,923 |
| 1975 | 22,500,000 | 1,730,769 |
| 1976 | 22,500,000 | 1,730,769 |
| 1977 | 22,500,000 | 1,730,769 |

Even the significance of the early figures was as clear at the time of the Atlanta franchise deal as it is now in hindsight. Five Smiths was obviously not going to forego the benefits of the League television pool—especially when television revenues were an important inducement for the purchase of the franchise.

■ Taxpayers also contend that, even assuming *arguendo* that Five Smiths did acquire the right to share in future television income, in addition to the rights under the four-year CBS contract, the latter constituted a separate asset which was depreciable. Taxpayers reason that Five Smiths' interest in the CBS contract had both a proven value (the $4,277,043 present value of the club's guaranteed income under the contract) and a definite four-year limited useful life. But as the Government correctly points out, the rights under the CBS contract were only a "four-year link" in a "perpetual chain" of television income.[20] Though the existing contract provided a measure of Five Smiths' television rights over a particular four-year period, nevertheless the rights were to continue indefinitely. Determining a valuation for the four-year CBS contract is unnecessary to our decision, since we hold that Five Smiths' television rights at issue have an unlimited useful life, and thus cannot be amortized. Because the rights pursuant to the CBS contract were only a link in a chain of revenue which would continue as long as

19. Government's original brief at 11.

20. *Id.* at 36.

the Atlanta Club holds an NFL franchise, they did not constitute a wasting asset so as to require being valued for amortization purposes, and we thus decline to value them.

Nor are we impressed by taxpayers' final argument on the issue of television rights that, since the CBS contract did not contain a renewal option, any further television contracts would require new bargaining between the networks and the NFL teams. Taxpayers argue on that basis that future rights do not extend the useful life of the four-year television contract. This argument is also without merit. Although the CBS contract provided a measure of the value of Five Smiths' television rights, the source of those rights was the Atlanta agreement. Indeed, the CBS contract preceded the entry into the League of the Atlanta Club. Five Smiths' right to share in the revenues from network television contracts is indefinite in duration, and continues as long as Atlanta remains a member of the League. The right has relevance far into the future. Televised NFL football is by now a national tradition. We can be confident that Five Smiths' television rights will have substantial value as long as there remains an NFL and a television set in every living room.

Applying Treas.Reg. § 1.167(a)–3 to the circumstances here, it is clear that the unlimited life of the television rights defeats any attempt to amortize the income received under the CBS contract.

## VI.

### Valuation of the Players' Contracts

The final issue involves the correctness of the district court's valuation of the players' contracts. The Government contends, as an alternative argument to its bundle-of-rights theory, that, even if the players' contracts could be separately valued, the district court's method of valuation was arbitrary and unsupported by the evidence and, thus, was clearly erroneous. The Government asserts, among other things, that the dis-

trict court's subtraction method of allocating the purchase price in the Atlanta deal among the various assets purchased was improper. It also complains of the district court's opinion on valuation of the players' contracts. Though we do not agree with the district court's subtraction, or residual, method of allocation, we nevertheless find that the evidence was sufficient to support the valuation reached by the trial court.

■ Basically, under *Houston Chronicle*, taxpayers must prove that the players' contracts had an ascertainable value separate and distinct from the value of the franchise (or, more generally, from goodwill), and a limited useful life, the duration of which could be measured with reasonable accuracy. It is uncontested that the players' contracts had a 5.25-year useful life. That the players' contracts had some value cannot be disputed. The IRS itself initially valued the players' contracts at over $1 million. The district court, after hearing a substantial amount of evidence in the case, valued the contracts at more than three times the figure fixed by the IRS. Indeed, it is clear that the players are the primary assets of a professional football club. Without them, there could not be a game. As Texas E. Schramm, the widely-respected President and General Manager of the Dallas Cowboys, testified:

> The players are your principal product, and it is players who are responsible for you[r] winning. They are responsible for the fans coming to your stadium. They are responsible for the income that you receive on television.
>
> Without the players, in professional football, you don't have anything.[21]

Furthermore, it is obvious that these players' contracts are not only intangible assets but are assets separate from the others purchased in the deal. The value of the players is almost entirely a function of their worth as professional football players.

As indicated earlier, the district court accepted a compromise valuation of the contracts which was submitted by the taxpay-

---

**21.** App. at 204.

ers. Taxpayers' evidence on valuation was based largely on expert testimony, which the Government, to a large extent, left uncontroverted.[22] Schramm testified that, in his opinion, the forty-two players' contracts purchased by Five Smiths had a fair market value in 1966 of $7,300,000. Schramm's valuations were based upon a sliding-scale rating system under which each player was classified in one of five categories, arranged in order of ascending potential player value to the team. In the lowest category were placed players who had at least made a professional football team, who were valued at $50,000 each. In the highest category were placed the players who, it was expected, would be starters, who were each valued at $250,000. In between at $50,000 increments in value were three other categories. After each of the players whose contracts were acquired by Five Smiths were so valued, Schramm's total came to $7,300,000. Schramm testified that his valuations were founded on personal knowledge of the veterans and on data which was in the record. He considered, among other things, the salaries which the Atlanta team was assuming under the acquired contracts. He also compared the veterans as a group to those rookies who were selected in the first three rounds of the 1965 college draft, and said that the veterans would have been more valuable to a professional team because of their experience.

James Finks, General Manager of the Chicago Bears and former General Manager of the Minnesota Vikings, arrived at a valuation of $6,825,000. Finks' valuation also reflected personal knowledge of the players, consideration of the data in the record, a comparison of the forty-two veterans with the rookies selected in the top rounds of the college draft, and the assumption that the experience factor made the veterans more valuable than the college rookies.

The district court rejected the two experts' valuations for two reasons. First, their total valuation figures greatly exceeded the $3,445,871.02 which the district court had determined was available for allocation to the players' contracts, after subtracting from the total purchase price under the so-called subtraction method the amounts allotted to the NFL membership fee ($50,000), interest ($727,086), and the calculated minimum present value of the television rights ($4,277,043). Second, the court said it disapproved of the comparison between rookie college players and proven veterans, but nevertheless gave substantial weight to comparison evidence.

Ultimately, the court relied on a compromise approach combining (1) the qualitative judgments of Atlanta's first coach, Norbert Hecker, as to the relative potential contributions to the team expected of the college rookies, on the one hand, and the NFL veterans, on the other; (2) the quantitative valuations of Schramm and Finks; and (3) the cost of acquiring the rookies. ·The method was as follows. A given veteran acquired in the expansion draft would be described in terms of size, talent, NFL experience, playing history, etc. The amounts paid to sign college rookies who played the same positions were then compared to the usually more modest salary rate of the veterans' contracts. The difference in price was invariably striking. Testimony by Hecker as to the relative potentials of the veterans and the rookies was also considered; such comparisons, as a rule, yielded the conclusion that the veterans were far more valuable to the team, since they were known quantities, while rookies were untried in the NFL and lacked professional experience. Based on the relative merits, then, the dollar valuations placed upon the veterans by the district court, which were

---

**22.** The Government points to two sources of evidence to support an allocation of approximately $1 million for the player contracts: (1) the IRS Engineering and Valuation Report, which recommended a total valuation of $1,050,000 for the players' contracts, App. at 880; and (2) the testimony of Dr. Roger Noll, an economist who was the Government's principal witness, Rec., vol. XII, at 92, from which the Government derives a total valuation of approximately $1.4 million, *see* Government's original brief at 93. The valuations in either instance involve the use of averaging. We find them thoroughly unpersuasive.

comparable to and sometimes even lower than those placed upon the rookies, were conservative, especially when compared to the valuations provided by Schramm and Finks.[23]

■ Since the valuation of assets is a factual finding, *Silverman v. Commissioner of Internal Revenue,* 2 Cir., 1976, 538 F.2d 927, 931, *cert. denied,* —— U.S. ——, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Anderson v. Commissioner of Internal Revenue,* 5 Cir., 1957, 250 F.2d 242, 249, *cert. denied,* 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958); *cf. United States v. Stringfellow,* 5 Cir., 1969, 414 F.2d 696, 699, the Rule 52(a), Fed.R.Civ.P., standard of review is applicable here. *Stringfellow, supra,* 414 F.2d at 699; *see Anderson, supra,* 250 F.2d at 249. Given the inherent imprecision of the valuation function, our application of that standard is guided by the principle announced by this court in *Anderson:*

> Valuation . . . is necessarily an approximation . . . It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence. . . .

250 F.2d at 249.

■ The various comparisons between veteran and rookie players provided a reasonably reliable measure of the value of the expansion draftees. The Government contends that comparing the bonus paid to a rookie college draftee with the fair market value of a veteran's contract is like comparing apples and oranges. We disagree.[24] The evidence in this case involved both quantitative and qualitative comparisons. The Atlanta team needed players to stock its squad and such players had to be acquired somewhere. If the Atlanta Falcons had been unable to obtain players in the expansion draft, they would have had to develop other players. The college draft provides the primary source of talent for professional football teams, and the prices in that marketplace showed the cost of substitute personnel herein. *Cf. Richard S. Miller, supra,* 537 F.2d 446, 456.[25] The absence of a regular cash market for veteran players necessitated reference to prices in the college draft.[26] Comparison evidence

---

**23.** The source of the $3,035,000 total valuation figure accepted by the court is unclear. The court presents this figure as taxpayers' own, based upon the method described in the accompanying text. In Plaintiffs' Supplemental Post-Trial Brief, it appears that the figure urged upon the court was actually $3,010,000. *See* Supplemental Post-Trial Brief for Plaintiffs at 33. However, that brief contained alternative methods of valuation, each of which reached a somewhat different result, but was designed to show that the proper figure was in excess of $3 million. Under one such method, based upon the average bonus cost of players chosen in the first five rounds of the college draft, taxpayers projected a figure of $3,036,000. *Id.* at 40. Given the total amount involved in this case, the relatively small size of the discrepancy in comparison, and the fact that the valuation of the players' contracts was inherently an estimate, we find it unnecessary to alter the district court's specific computation for the reason that it is unexplained. *See generally Archer v. Commissioner of Internal Revenue,* 5 Cir., 1955, 227 F.2d 270, 273.

**24.** The Government also complains about individual dollar figures employed by taxpayers in their comparisons between particular players. In light of the nature of our task, it is plain that the district court's valuation, involving as it does millions of dollars and dozens of players' contracts, does not stand or fall on this type of attack.

**25.** In *Richard S. Miller* the court said that the value of insurance "expirations," which were useful in the insurance industry in soliciting renewals of policies, was measured by the cost the purchaser of the "expirations" would have incurred to develop an equivalent quantity of new business. *Id.,* 537 F.2d at 456.

**26.** To be sure, those prices were high because of the intense price competition for players due to the NFL–AFL war. However, the valuation of the veterans' contracts must take account of the economic realities at the time of acquisition.

The Government argues that the lack of a cash market for the veteran players is one reason that the comparison was invalid. Even as a general proposition, we are disinclined to accept this argument. *See* 10 Mertens, *supra,* § 59.01, at 5 n. 24. Moreover, the absence of such a regular market is no reflection on the value of the veterans. Veteran players are regularly traded for other players or draft choices. Thus, a market exists, only cash is

was competent and relevant. And the use of such a comparison approach—of valuing an asset by determining what similar assets were sold for in arm's length transactions—has met with the approval of this court. *See, e. g., Green v. United States,* 5 Cir., 1972, 460 F.2d 412; *Phillips Petroleum Co. v. Bynum,* 5 Cir., 1946, 155 F.2d 196, *cert. denied,* 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620.

As a qualitative matter, the Government maintains that top-round college draft picks who were the cream of the crop in their sport cannot be compared with veteran players who were in some cases "aged" and/or "marginal" and whose own teams were willing to give them up. Yet there was ample evidence that, in fact, the veterans were considered superior as a group to the college rookies. Each man acquired in the expansion draft had made an NFL team. A number of them had been starters for their selling teams. The evidence also showed:

—The forty-two players had a total of 149 years of prior experience in the NFL, or an average of approximately 3.55 years per man.

—Twenty-five players were on Atlanta's active roster at the start of the 1966 season; of those, eighteen started regularly and the other seven were starters on occasion. All but three of the twenty-five players wound up the season on the Falcons' active roster.

—Of the seventeen players who did not begin the 1966 season on the active roster, two were traded (one of them for another player who made the squad); one was placed on the injured reserve list; four players were waived and claimed by other teams (for which those players played in 1966); three were placed on Atlanta's reserve list. Only seven men were released entirely and did not play football.

—The start of the 1967 season saw the return to the active roster of nineteen of the expansion draftees. All but two played regularly throughout the season. Two were traded during the season.

—Eight of the original group of veterans remained on the active roster of the club throughout the following season.

—Ultimately, thirteen of the forty-two veterans were traded. In exchange for those players, the club received fourteen draft choices and also five players who became Falcons starters.

—Although none of the draftees remained on the squad after the 1968 season, others who had been acquired in exchange for those players were still with Atlanta.

These players may not have been the cream of the crop of veterans in the NFL, but they were far from "marginal" players. The evidence, buttressed by the experts' testimony as to the relative superiority of the veterans over the rookies, clearly shows that the expansion draftees had substantial value. Furthermore, the total valuation figure reached by the trial court was well within the range of figures supported by the evidence.

■ The district court was justified in finding that the witnesses were credible. "Tex" Schramm's name is a household word in pro football and is synonymous with professional management in the NFL. As President and General Manager of the Dallas Cowboys, which was an expansion team, he has engaged in precisely the types of judgments called for in the instant case. Finks is also well known; he, too, is the General Manager of an expansion team and is widely regarded for his expert knowledge. Hecker was Atlanta's first coach, and dealt with these players personally on a professional basis. The trial judge was also justified in discounting the testimony, as he thought necessary, in the process of valuing the players' contracts. Insofar as Schramm and Finks were expert witnesses, the court was not bound by their opinion testimony, but could weigh it along with the other

not the currency. Also, the fact is that an NFL franchisee, *i. e.,* Five Smiths, did actually pay cash to member teams for its veterans' contracts.

evidence. *Silverman, supra,* 538 F.2d at 933; *Logan Lumber Co. v. Commissioner of Internal Revenue,* 5 Cir., 1966, 365 F.2d 846, 852–53; *Anderson, supra,* 250 F.2d at 249. On the other hand, the testimony of Hecker, who was Atlanta's head coach and who had closest knowledge of these players, was properly credited by the court. *See Houston Chronicle, supra,* 481 F.2d at 1253. His testimony as to qualitative value was highly probative of the dollar valuations, in light of the other quantitative evidence.

█ The fact that the valuation method adopted by the district court arrived at what was, in essence, a compromise figure—roughly midway between the positions of the parties—in no way diminishes the validity of that valuation. The district court was called upon to measure the worth of men, not machinery, a task of no small proportions. In a situation like the one at bar, arriving at a compromise figure was an acceptable valuation solution. *See Anderson, supra,* 250 F.2d at 248–49.

█ Our opinion as to the accuracy of that figure is reinforced by recent legislation dealing with the transfer of players' contracts in connection with the sale of a sports franchise. Under section 212 of the Tax Reform Act of 1976, Pub.L.No.94–455, 90 Stat. 1545 (codified at 26 U.S.C. § 1056(d)), there is a presumption that

not more than 50 percent of the [total] consideration [in the sale] is allocable to contracts for the services of athletes unless it is established to the satisfaction of the Secretary that a specified amount in excess of 50 percent is properly allocable to such contracts. Nothing in the preceding sentence shall give rise to a presumption that an allocation of less than 50 percent of the consideration to contracts for the services of athletes is a proper allocation.

Because the instant transaction took place before December 31, 1975, it is not governed by the Act. *Id.,* 26 U.S.C. § 1056 note. However, the presumption clearly indicates Congress' view that, as a general proposition, half the total consideration for a sports franchise properly may be allocated to the players' contracts. In the light of the congressional presumption, the district court's valuation figure was reasonable.

Finally we consider the problem of apportionment of basis, or the Government's quarrel with the so-called subtraction method of the district court. At the heart of the Government's argument is the premise that the total of the individual asset values herein was greater than the lump sum purchase price. For example, the Government maintains that the television rights were greatly undervalued and that the territorial rights were not valued at all, even though the latter were worth more (in the Government's view) than the television rights. According to this argument, the result under the subtraction method is different, depending upon where the analysis begins. To begin with the television rights herein (as valued by the Government), for example, would leave nothing of the total purchase price for allocation to the players' contracts.

The Government contends that the proper way to allocate cost among a group of assets acquired in a bundle, where it can be shown that the sum of the individual values is unequal to the total purchase price, is to determine values based upon the relative fair market values of the individual assets in relation to the total cost. It is further argued that such an approach requires the valuation of each one of the assets acquired in the deal. The Government maintains that this approach is mandated by Treas. Reg. § 1.167(a)–5, which provides in pertinent part:

*Apportionment of basis.* In the case of the acquisition . . . of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. . . .

The regulation requires a determination of a particular asset's proportional value in relation to the total package. If we assume *arguendo* the correctness of the Government's contention that the sum of individual asset values was greater than the total purchase price herein, then the subtraction method was improper. We have, of course, rejected the subtraction approach taken below and for reasons we have expressed. However, the regulation does not require the valuation of each of the assets in the deal. In this case, the basis of the players' contracts can be calculated without valuing every right acquired by Five Smiths, and the regulation does not require such additional valuations.

The district court found that the players' contracts were worth $3,035,000. We have accepted that finding. The total value of the bundle of assets [*i. e.*, of those remaining in dispute, after subtracting the membership fee and interest) was $7,722,914. For it has been held that "fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts." *Jack Daniel, supra,* 379 F.2d at 574; *Anderson, supra,* 250 F.2d at 249. *See generally* 10 Mertens, *supra,* § 59.01, at 4. The Atlanta deal was such a transaction. Therefore, the value of the bundle of rights was what Five Smiths paid for it.

Accordingly, the regulation is satisfied, and the district court's holding as to the amortization of the value of the players' contracts at the sum of $3,035,000 is correct.

AFFIRMED.