## FIRST NORTHWEST INDUSTRIES OF AMERICA, INC., Appellee,

v.

## COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 79–7442.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1981.

Decided June 29, 1981.

Rehearing and Rehearing En Banc Denied Sept. 14, 1981.

Richard Farber, Washington, D. C., for appellant.

Rodney J. Waldbaum, LeSourd, Patten, Fleming, Hartung & Emory, Seattle, Wash., for appellee.

Before WRIGHT and ANDERSON, Circuit Judges, and TAYLOR, Senior District Judge.*

WRIGHT, Circuit Judge:

This case presents a novel issue concerning the tax treatment of a professional sports team. The commissioner appeals the Tax Court's decision, *First Northwest Industries v. Commissioner*, 70 T.C. 817 (1978), and we reverse and remand.

### I. BACKGROUND

Taxpayer purchased a National Basketball Association team, the Seattle Supersonics, in 1967.[1] It acquired 13 related rights:

1. The right to participate in a special expansion draft in which it could select 15 veteran players from ten existing teams;

2. The right to participate in the 1967 college draft;

3. The right to participate in all post-1967 annual NBA college drafts;

4. The right to participate in NBA basketball by competing against other teams, including the right to retain all home-game gate receipts;

5. The exclusive right to exhibit NBA basketball within a 75-mile radius of Seattle;

6. The right to an equal share (with other team owners) of all revenues derived from national broadcasting of NBA games;

---

* Of the District of Idaho.

1. The Sonics actually were purchased by taxpayer's predecessor in interest. This is immaterial to the disposition of this appeal.

7. The exclusive rights for local broadcasting of Sonics' games;

8. The right to an equal share of revenues derived from NBA promotional and merchandising activities;

9. The right to an equal share of revenues derived from NBA playoff and all-star games;

10. The right to enjoy the benefits of NBA reputation and goodwill;

11. The rights (and obligations) of participating in a system which establishes within the NBA of priority rights to players and the bargaining rights of each team with respect to its own players;

12. The right to share equally in the proceeds from future NBA expansions;

13. Other rights, benefits, and obligations attendant to being a member of the NBA. 70 T.C. at 823–25.

Taxpayer's total cost was $1,750,000. The Tax Court allocated $250,000 to the right to share in the 1968 expansion proceeds, and $500,000 to the right to participate in the special expansion draft. It found that these rights had a limited useful life and permitted taxpayer to amortize them.[2]

These findings and conclusions are not challenged on appeal which leaves a cost of $1,000,000 for the remaining rights.

## II. ISSUE ON APPEAL AND POSITIONS OF THE PARTIES

In 1970 the NBA expanded by selling new teams in Portland, Buffalo, and Cleveland. The proceeds were distributed equally to the existing owners, including the taxpayer. The issue on appeal concerns tax treatment of these proceeds.

### A. The Tax Court's Opinion

The commissioner conceded that capital gains treatment is appropriate. The Tax

Court reasoned from this concession that there was a transfer of a capital asset, and that taxpayer may subtract its basis (the cost of acquiring that asset) in computing the gain it realized from the expansion proceeds.

Taxpayer has a unique dual role. First, it is a member of the joint venture which exists to administer a professional basketball league. Second, it is an independent business entity, with full responsibility for its own profits and losses.

All team owners make small capital contributions to the joint venture. The amount paid for a new team, however, does not pay for an interest in the joint venture but for the property rights outlined above. The Tax Court labelled these rights (other than the two it permitted taxpayer to amortize) as the "basic nonterminable rights" possessed by all NBA team owners.

The Tax Court reasoned that, because there were 14 owners prior to the 1970 expansion, taxpayer had a $1/14$ interest in these rights. After expansion, it had a $1/17$ interest. Hence, a proportion of its original interest[3] had been transferred to the expansion teams. The Tax Court held that taxpayer could subtract from the expansion proceeds an equivalent proportion of its $1,000,000 cost (approximately $175,000).[4]

### B. The Commissioner's Position

The commissioner argues that the rights transferred to the new owners were "created" by the existing teams.

"[T]he rights obtained by the new teams were not siphoned from the existing teams but rather were entirely new rights created when the league approved the expansion plan and granted the franchises."[5]

The commissioner concludes that the franchise rights acquired by the taxpayer were not transferred to the new owners and, therefore, taxpayer has no basis to

---

2. See Note, *Federal Income Tax—Amortization and the Expansion Sports Franchise*, 54 Wash. L.Rev. 827 (1979), for an analysis of this aspect of the Tax Court's decision.

3. The proportion is $(1/14 - 1/17) \div 1/14$.

4. Six judges dissented. 70 T.C. at 868.

5. Appellant's Opening Brief at 10.

subtract from the amount realized in computing taxable gain.[6]

### C.  The Taxpayer's Position

Taxpayer makes two arguments in support of the Tax Court's decision.  First, it argues that its "basic nonterminable rights" can be treated as a partnership interest, and that it sold a portion of this partnership interest to the new owners.  Second, taxpayer identifies specific, valuable rights that it transferred to the new owners.

## III.  ANALYSIS

### A.  Taxpayer's Partnership Theory

The Tax Court determined that the "basic nonterminable rights" held by the team owners were held apart from their interests in the formal NBA joint venture.  Taxpayer argues that these rights should be treated as a partnership interest.  When new teams were sold in 1970, the existing owners allegedly transferred a portion of their partnership interests.  Sale of a portion of a partnership interest is treated as a sale of a capital asset under I.R.C. § 741.  See Rev. Rul. 59–109.

We reject this approach.  A partnership is:

> a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate.

I.R.C. § 761.

The Tax Court found that the formal NBA joint venture (a partnership for federal tax purposes) was "organized to operate a professional sports league, oversee its super structure, and maintain, in an orderly manner, the exhibition of basketball among its competing members."  70 T.C. at 864.  To the extent that there is an "organization through or by means of which any business, financial operation, or venture is carried on," it is the formal joint venture, not a separate partnership comprised of the team owners.

Second, all of the assets acquired by taxpayer in 1967 are not "operated in common."  Each owner retains its home-game gate receipts, has exclusive rights to local broadcasting, and is responsible for its own profits and losses.  See 70 T.C. at 865.

### B.  The Commissioner's Franchise Theory

The commissioner argues that taxpayer purchased a franchise in 1967 and that, because the franchise is still intact, taxpayer has not transferred anything to the 1970 expansion teams.  He points to taxpayer's rights to retain home-game gate receipts and local broadcasting revenues as indicative of its franchise rights.  These rights remained intact after the 1970 expansion.

This approach overlooks those rights acquired by the taxpayer that did not remain intact after the expansion.  For example, prior to expansion taxpayer had a right to $1/14$ of the national broadcasting revenues.  After expansion, taxpayer's share was reduced to $1/17$.

The commissioner tells us that the value of national broadcasting revenues increased as a result of expansion.  Even if this were factually correct, it is irrelevant.  A transfer of a portion of the asset held by taxpayer and an increase in the value of its remaining interest are not inconsistent.[7]

### C.  Assets Transferred to Expansion Team Owners

We conclude that some, but not all, of the rights acquired by taxpayer in 1967 were partially transferred to the new owners.  We agree with the commissioner that taxpayer's "franchise" rights, i. e., its right to participate in the NBA and its exclusive

---

**6.**  The parties agree that taxpayer is entitled to subtract its basis in player contracts lost through the special draft for the 1970 expansion teams.

**7.**  A simple example highlights the principle.  If a taxpayer purchases a parcel of land, and then sells a portion to a developer, she is entitled to subtract her basis in the portion sold in computing taxable gain.  Even if the purpose of the sale was to increase the value of the remaining portion, and an increase results, the taxpayer may still subtract her basis in the portion sold.

rights to local broadcasting and to exhibit NBA basketball within a 75-mile radius of Seattle, were not transferred.[8] The Tax Court erred in including the cost of acquiring these rights in its calculation of taxpayer's basis.

A portion of the remaining "basic nonterminable rights" was transferred.[9] The Tax Court made no attempt, however, to determine the cost of these rights. Only if their cost can be satisfactorily ascertained may taxpayer subtract its basis in the portion transferred.[10] *See United States v. Laird*, 556 F.2d 1224 (5th Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978) (permitting amortization of player contracts because they had *ascertainable value* and limited useful life); *Ralph W. Fullerton Co. v. United States*, 550 F.2d 548 (9th Cir. 1977) (refusing to permit loss deduction for lost accounts where cost of individual accounts could not be satisfactorily ascertained).

On remand, the Tax Court will determine whether there is sufficient evidence to ascertain the cost of the rights which were transferred. If there is, taxpayer may subtract its basis.

REVERSED AND REMANDED.

---

**8.** By taxpayer's right to participate in the league we refer to its right to have its team play other NBA teams, and its right to participate in the NBA draft and the system for assigning bargaining rights to players.

Taxpayer argues that its right to participate in the exhibition of NBA basketball by competing against other NBA teams was diminished when expansion teams were added to the league. It retains all of the gate receipts at home games. It contends that those receipts will be reduced because it will play the "best" teams less often, and that there is greater attendance at games against the best teams. Like the commissioner's argument with respect to broadcasting revenues, this argument confuses the impact of expansion on the value of a right with the transfer or retention of that right. Taxpayer retained the right to participate in the exhibition of NBA basketball and to retain home-game gate receipts, regardless of the post-expansion value thereof.

It can be added, however, that there is no support in the record for taxpayer's argument that the value of this right was reduced by expansion. Of the expansion teams admitted since 1967, three (Milwaukee, Seattle, and Portland) have won NBA championships and, for a time at least, could have been considered the "best" teams. In addition, expansion teams can develop regional rivalries which increase attendance.

The Tax Court made no findings on the effect of expansion on gate receipts. It did find that "[a]lthough NBA expansion teams have generally done poorly in an artistic and competitive sense during the first few years of the franchise's existence, they, Seattle being one, have frequently done rather well in terms of gate receipts." 70 T.C. at 830.

**9.** These include the right to share in national broadcasting revenues, all-star and playoff game proceeds, expansion proceeds, and proceeds of NBA promotional and advertising activities.

All of the "basic nonterminable rights" acquired by taxpayer derive value from the league's goodwill, and the sale of new teams is a "portioning out" of NBA goodwill. *See* Rev. Rul. 71–583. The critical question on remand will be whether there is sufficient evidence to allocate the $1,000,000 cost between those rights which were and those which were not transferred. Recognizing that they all are related to goodwill does not resolve that question.

**10.** We see no error in the formula used by the Tax Court. *See* note 3, *supra*. It presumes that each existing owner transferred an equal proportion of its rights to the new owners. Taxpayer suggests it lost more than other owners. We see no support in the record for this argument. *See* note 8, *supra*.