**Grace W. DOBSON**

v.

**The UNITED STATES.**

No. 73–79.

United States Claims Court.

Nov. 19, 1982.

Robert C. Wolter, Corpus Christi, Tex., attorney of record, for plaintiff. Wood, Roykin, Wolter, Smith & Hatridge, Corpus Christi, Tex., of counsel.

Israel D. Shetreat, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

## OPINION

WHITE, Judge.

In this action for the refund of income taxes paid by the plaintiff over a 5-year period, the principal issue is whether the plaintiff was entitled to amortize, for income tax purposes, certain written franchise agreements that had been entered into in connection with a business enterprise frequently referred to in the record as the Whataburger franchise operation.[1]

For the reasons stated in the opinion, it is concluded that the franchise agreements were not amortizable.

---

1. Some oral franchise agreements were also entered into, but the plaintiff does not contend that they were amortizable.

The events leading up to the present action can be traced back to the early 1950's, when the plaintiff's late husband, Harmon A. Dobson (Mr. Dobson), a resident of Corpus Christi, Texas, began to utilize the trademark "Whataburger" in connection with some fast-food, chain-style stands which he established in Corpus Christi and elsewhere in South Texas for the sale of hamburger sandwiches.

The earliest Whataburger stands were owned by Mr. Dobson, either personally or through a wholly owned corporation. Rather early in the program, however, Mr. Dobson began the Whataburger franchise operation.

In the beginning of the Whataburger franchise operation, it was Mr. Dobson's practice to purchase a parcel of land, build (or have his corporation build) on it a Whataburger stand, and enter into an agreement, oral or written, with a friend, whereby the friend would operate the Whataburger stand in accordance with Mr. Dobson's instructions and supervision.

The Whataburger franchise operation was very successful. An important factor in the success of the enterprise was Mr. Dobson's insistence that franchisees adhere to high standards as to cleanliness and quality of ingredients, and his actions in making sure that they did so. This developed goodwill for the Whataburger trademark.

On September 24, 1957, Mr. Dobson registered the name "Whataburger" with the United States Patent Office as a trademark for a period of 20 years. Subsequently, on September 24, 1977, the trademark was renewed for an additional period of 20 years.

As the Whataburger operation began to grow and prosper, and after the registration of the trademark "Whataburger," Mr. Dobson would either purchase or lease a parcel of land, construct a Whataburger stand on it, and then rent or sublease the ground and the building to an operator under an oral agreement or a written "Franchise Lease" or "Franchise Agreement." The franchisee was granted an exclusive right to operate on the premises a Whataburger stand or restaurant in accordance with Mr. Dobson's instructions and supervision. The franchisee would pay Mr. Dobson 4 percent of the gross receipts for "ground rent," 3 to 5 percent of the gross receipts as "building rent," and an additional 2 percent of the gross receipts for the use of the tradename "Whataburger."

Mr. Dobson was the driving force of the Whataburger operation. He was a dynamic person, with great energy and an unusual business sense, who singlehandedly selected the sites for the Whataburger restaurants and the franchisees to operate them. He personally recruited and trained these individuals, visited them and their franchise stands regularly, and maintained close personal contacts with them between visits.

On April 11, 1967, while returning to Corpus Christi from a visit to one of his franchised stands, Mr. Dobson was killed in an airplane crash.

Among the assets included in Mr. Dobson's estate for federal estate tax purposes was the trademark franchise operation known as "Whataburger"; and included in this operation were various franchise agreements, oral and written, between Mr. Dobson and his franchisees.

The plaintiff, Mr. Dobson's widow, was the principal beneficiary under Mr. Dobson's will. By virtue of the will, the plaintiff acquired the full rights to the "Whataburger" tradename and the business establishment which operated under that name (i.e., the Whataburger franchise operation).

The trademark "Whataburger" was included in Mr. Dobson's gross estate for estate tax purposes; and, in the estate tax return, Mr. Dobson's community interest in the trademark was valued at one-half of $79,616.[2] The Internal Revenue Service challenged that item in the estate tax return, and proposed a valuation of $842,246. During the negotiations that followed between the estate's representatives and the Internal Revenue District conferee, the estate contended that the returned value was grossly overstated, and that the "Whata-

---

**2.** Texas is a community property State.

burger" trademark should have been valued at $7,816.96. Subsequently, Leland E. Fiske, the estate's expert, submitted an appraisal report proposing a valuation of $385,906.

The estate's tax liability was ultimately settled on the basis of a trademark valuation of $444,124. This figure was arrived at by determining the income generated by the franchise agreements, projecting this income into the future, and then reducing it to its then-present value.

An independent value was never assigned or allocated to the franchise agreements, as such, for estate tax purposes. Their fair market value was not separately included in Mr. Dobson's gross estate for tax purposes, and no federal estate tax was specifically paid on account of the franchise agreements.

By virtue of timely claims for the refund of income taxes which the plaintiff filed for the years 1967, 1968, and 1969, and deductions which she took on her income tax returns for the years 1970 and 1971, the plaintiff claimed the right to amortize the Whataburger franchise agreements, asserting a tax basis as of April 11, 1967, the date of Mr. Dobson's death.

The Internal Revenue Service disagreed with the plaintiff's contention, did not allow the plaintiff's claims for refund with respect to 1967, 1968, 1969, assessed and collected income tax deficiencies, plus interest, with respect to 1970 and 1971, and then failed to allow the claims for refund which the plaintiff filed for 1970 and 1971.

The present litigation followed.

The pertinent statutory provision is 26 U.S.C. § 167(a), which states in part that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion * * * of property used in the trade or business [of the taxpayer] * * *."

We are dealing in this case with franchise agreements, which are a form of intangible property; and an applicable Treasury Regulation (26 C.F.R. § 1.167(a)–3) provides as follows:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures see section 177 and the regulations thereunder.

■■ An intangible asset can be amortized for depreciation deduction purposes if the asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy. *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1250–51 (5th Cir.1973); *Richard S. Miller & Sons v. United States,* 210 Ct.Cl. 431, 439, 537 F.2d 446, 452 (1976). Whether these factors are present in a particular case, and whether the intangible asset involved in the case is therefore amortizable for income tax purposes, must be determined on the basis of the facts in the case. *Houston Chronicle Publishing Co. v. United States, supra,* 481 F.2d at 1253; *Richard S. Miller & Sons v. United States, supra,* 210 Ct.Cl. at 439, 537 F.2d at 452; *Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 621–22, 608 F.2d 485, 507 (1979).

■ The burden of proving that an intangible asset is amortizable for income tax purposes, because it has an ascertainable value separate and distinct from goodwill and it has a limited useful life, is cast on the taxpayer. *Houston Chronicle Publishing Co. v. United States, supra,* 481 F.2d at

1254. This is a "heavy burden" (*Richard S. Miller & Sons v. United States, supra,* 210 Ct.Cl. at 439, 537 F.2d at 452), although only reasonable certainty or reasonable approximation is required (*Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1238 (7th Cir.1969)).

In the present case, the plaintiff has not met her heavy burden of proof.

■ With regard to the matter of value, the evidence in the record shows clearly that the written franchise agreements in existence on the date of Mr. Dobson's death had value as part of the Whataburger franchise operation as a going concern. On the other hand, the evidence also shows clearly that the franchise agreements were an integral and inseparable part of the Whataburger trademark, that there was no market for the franchise agreements as such, separate and apart from the Whataburger trademark and its goodwill, and that they could be sold and traded only together with the trademark. *Cf. Laird v. United States,* 556 F.2d 1224, 1234 (5th Cir.1977). Hence, the essential factor of an ascertainable value separate and distinct from goodwill has not been established by the plaintiff in this case.

In addition, proof is lacking that the written franchise agreements each had a limited useful life of reasonably ascertainable duration. Of course, it is possible to ascertain for each written franchise agreement, as of the date of Mr. Dobson's death, the length of the unexpired portion of the agreement's term and the extent to which the term could be extended by virtue of an option or options. However, the stated provisions of an agreement concerning its term did not necessarily establish the duration of the agreement. *Super Food Services, Inc. v. United States, supra,* 416 F.2d at 1238. The burden was on the plaintiff to go further and prove that the franchise agreements did not possess any reasonable prospect of continuity beyond the terms provided for in them. *Meredith Broadcasting Co. v. United States,* 186 Ct.Cl. 1, 30, 405 F.2d 1214, 1231 (1968); *Forward Communications Corp. v. United States, supra* 221 Ct.Cl. at 621–22, 608 F.2d at 507; *cf. Western Mortgage Corp. v. United States,* 308 F.Supp. 333, 340 (C.D.Cal.1969).

The evidence in the record, rather than proving a lack of any prospect of continuity, actually indicates that all the written franchise agreements possessed strong prospects of continuity beyond the terms provided for in them. The plaintiff desired to continue the stream of income derived from the agreements, and she was willing to renew options provided for in agreements and to renew agreements that might expire. On their part, the franchisees belonged to a successful operation, and they had no apparent reason for terminating the relationship.

In summary, the plaintiff had the burden of proving both (1) that the written franchise agreements had an ascertainable value separate and distinct from the Whataburger trademark and its goodwill, and (2) that the agreements had a limited useful life, the duration of which could be ascertained with reasonable accuracy; and the plaintiff failed to prove either of these essential elements.

It necessarily follows that the plaintiff is not entitled to recover, and the petition must be dismissed.

## CONCLUSION OF LAW

On the facts, as found by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover. The petition will be dismissed.

It is so ordered.