Daniel R. and Patricia C. **McCARTHY, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. C78–1480.

United States District Court, N.D. Ohio, E.D.

Oct. 8, 1985.

Sheldon Sager, Cleveland, Ohio, for plaintiffs.

Jason Green, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On November 6, 1978, plaintiffs, Daniel R. and Patricia C. McCarthy, filed the above-captioned case against the United States of America challenging income tax deficiencies assessed and collected by the Internal Revenue Service (IRS) for fiscal years 1973 and 1974. Jurisdiction is invoked pursuant to 28 U.S.C. § 1346(a)(1).[1] The case is currently before the court on cross-motions for summary judgment. For the following reasons, the plaintiffs' motion is denied and the government's motion is granted.

### I.

On March 22, 1973, the New York Yankees Partnership ("Partnership") purchased the New York Yankees professional baseball franchise from the New York Yankees, Inc. (NYY Inc.). *See* Purchase Agreement, Def's. Exh. I. The Partnership acquired:

> (1.)(a) ... All of the properties and assets of NYY of every kind, nature and description, tangible and intangible, ... and described as including ...:

> \* \* \* \* \* \*

> (v) All contract rights and other assets of NYY, including ...:

> \* \* \* \* \* \*

> (4) ... radio and television broadcasting contracts,

> \* \* \* \* \* \*

> (9) the goodwill of NYY's businesses, and

> (10) all rights of NYY to use the name "New York Yankees" and any name including the term "Yankees".

*Id.* The Partnership paid NYY Inc. Ten Million Dollars ($10,000,000.00) and assumed certain of its liabilities and obligations. *Id.*, ¶'s (1.)(c), (2.).

Plaintiff, Daniel R. McCarthy, owns a three (3) percent interest in the Partnership and is entitled to deduct a pro rata share of the Partnership's losses from the gross income on his individual tax returns.[2] For fiscal years 1973 and 1974, plaintiffs took amortization deductions for the radio and television broadcasting contracts which the Partnership acquired when it purchased the Yankees. The Internal Revenue Service ("IRS") denied those deductions and assessed deficiencies. Plaintiffs paid the de-

---

1. 28 U.S.C. § 1346(a)(1) provides:
   (a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:
   (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws; ...

2. Mrs. Patricia C. McCarthy is a party to this suit because she filed a joint return with her husband, Daniel R. McCarthy.

ficiencies and filed timely claims for re-funds.[3] The IRS denied the refund claims and this suit followed.[4]

It is uncontroverted that an inherent right of a baseball franchise is the right to broadcast games:

> Ownership of a professional baseball franchise includes rights, duties and obligations created by the baseball industry through the Major League Agreement ..., Major League Rules ..., and the American League Constitution.... *An element of an American League Baseball Franchise is the ownership of "property rights in the baseball games played within one's park, including the reports, descriptions, accounts and reproductions thereof"....* Absent any limitations, this property right gives the franchise owner an ability to market his product by:
>
> 1. charging admission to the public; and
> 2. *contracting with segments of the broadcasting media for dissemination over the public airwaves.*
>
> The American League Broadcasting Agreement and the Major League Central Fund Agreement have placed limitations on that right by setting forth rules and regulations relating to local and national broadcasting of major league baseball.

*See* Plaintiffs' Response to Defendant's First Motion for Partial Summary Judgment at 3 (emphasis added) ("Plaintiff's Response"). The IRS contends that the plaintiffs are attempting to amortize their share of the Partnership's broadcasting rights. *See* Defendant's Reply Memorandum at 5–6, fn. 3. Whereas, the plaintiffs argue that the Partnership purchased "a right to receive a series of future payments" that arose when NYY Inc. severed some of its broadcasting rights from the franchise and sold them under the broadcasting contracts. *See* Plaintiff's Response at 7–8. Plaintiffs contend that the Partnership may amortize the present value of its right to this stream of income over the life of the broadcasting contracts just as a pensioner may deduct the return of his investments in a pension fund over the period of his expected life. *See* 26 U.S.C. § 72.

Alternatively, plaintiffs argue that they need not recognize any of the income which the broadcasting contracts generated. They rely on the assignment of income doctrine, contending that NYY Inc., the predecessor, was the proper party to pay taxes on the income from the broadcasting contracts. Thus, plaintiffs would not take amortization deductions off-setting this income; instead, they would simply not recognize the income.

Plaintiffs allege that there are three distinct broadcasting contracts at issue in this case: (1) a contract between the National Broadcasting Company ("NBC") and the Commissioner of Major League Baseball ("network broadcasting contract"), (2) a contract between WPIX, a local New York City television station, and NYY, Inc. ("local television broadcasting contract"), and (3) a contract between Strauss Broadcast-

---

**3.** 26 U.S.C. § 6511(a) provides:

> **(a) Period of limitation on filing claim.** —Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid.

**4.** 26 U.S.C. § 6532(a)(1) provides:

> **(a) Suits by taxpayers for refund.**—
>
> **(1) General rule.**—No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary or his delegate to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

ing Group, Inc. ("Strauss") and NYY Inc. ("radio broadcasting contract").

*The Network Broadcasting Contract.* The network broadcasting contract grants NBC the exclusive right to televise nationally the Game of the Week, playoff games, the All-Star game, and the World Series.[5] The named parties to the contract are NBC and the Commissioner of Major League Baseball ("Commissioner").[6]

On December 1, 1972, all Clubs of Major League Baseball entered into an agreement entitled, the Major League Agreement In Re Major Leagues Central Fund ("Major League Agreement").[7] NYY Inc. derived its rights under the network broadcasting contract between the Commissioner and the network from the agreement between the major league clubs and the Commissioner. The Major League Agreement confers on the Commissioner authority to sell as a pool each Club's right to broadcast its games nationally. ¶ 4. It imposes on the Commissioner a number of duties associated with the management of the funds from this sale such as (1) making payments to the Pension Fund of the Major League Player's Association, (2) providing funds to cover the administrative costs of the Commissioner's office and of the Major League's Executive Council, and (3) maintaining a reserve fund of One Million Dollars ($1,000,000.00) for the Commissioner's Office. ¶ 5. The Agreement entitles each Club to an annual pro rata share of the profits remaining after these expenditures and provides for automatic, perpetual renewal unless any four (4) Clubs of either the National or American League give notice to the Commissioner of their intent to terminate it. ¶'s 5, 7. Finally, it includes a clause which states:

> 9. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto *as members of their respective Leagues.*

(emphasis added).

*The Local Television Broadcasting Contract and the Radio Broadcasting Contract.* The local television broadcasting contract grants WPIX the exclusive right to televise Yankee games in the New York City area.[8] ¶ 2.(a). Under the contract, WPIX and NYY Inc. agree to divide the revenue from advertising and the licensing of other broadcasts. ¶'s 7, 8. WPIX promises to televise between 70 and 100 Yankee games each season. ¶'s 1.(i), 2.(a), 4. Each party agrees that the one may assign the contract if the other consents. ¶ 20. Finally, the contract provides that sixty (60) days before the end of the 1974 season, NYY Inc. and WPIX will negotiate an extension of the contract. ¶ 3. If the parties do not reach an agreement by the end of the season each agrees to provide the other with its best offer, and NYY Inc. promises that it will not enter into a contract with another local television station which incorporates terms as favorable as WPIX's best offer unless it first reoffers those terms to WPIX.[9] *Id.*

---

5. Agreement between The Major League Baseball Television Committee and NBC News, Def.'s Exh. R. at 2–3; April 29, 1971 letter from NBC to Bowie K. Kuhn, Commissioner of Baseball and February 14, 1972 letter from NBC to Kuhn, Def.'s Exh. C.

6. *Id.*

7. The Major League Clubs first entered into the Major League Agreement In Re Major Leagues Central Fund on December 1, 1961. They amended it on December 1, 1962, July 1, 1967, December 1, 1968 and December 1, 1972. The 1972 amendments were in force when the Partnership purchased the Yankees franchise in 1973.

8. Where the local television broadcasting contract conflicted with the network broadcasting contract, the network broadcasting contract was given priority. Local television broadcasting contract, ¶'s 2.(b), (c); 15.

9. Paragraph 3. the local television broadcasting contract provides:

> This Agreement shall remain in force for the 1972, 1973 and 1974 seasons. NYY shall conduct first negotiations with Station during the sixty (60) day period commencing August 1, 1974 in an attempt to reach agreement upon terms applicable for the extension of this Agreement. During such period, Station and NYY shall endeavor to reach mutual agreement upon such terms as will be applicable for such extension. Immediately upon the

The radio broadcasting contract obligates Strauss to broadcast on its New York City radio station all regular season games of the Yankees. ¶ 2. Under the contract, NYY Inc. retains all property rights to the radio broadcasts of its games. ¶ 19. NYY Inc. agrees to pay Strauss a calculated portion of the revenues which it generates through the sale of advertising. ¶ 9. NYY Inc. has the right to assign the contract without prior approval of Strauss. The contract terminates at the end of 1974. ¶ 2; June 30, 1972 and June 29, 1973, Letters from Strauss to NYY Inc. Def.'s Exh. T.

## II.

The assignment of income doctrine requires the assignor of income to recognize it as ordinary income. *Helvering v. Eubank*, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940); *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). When the property of the assignor generates income, the assignor realizes the income by the exercise of the power to assign it. *Id.* The doctrine does not apply to an assignor who divests himself or herself of title to the property which generates the income. *Blair v. Commissioner*, 300 U.S. 5, 14, 57 S.Ct. 330, 334, 81 L.Ed. 465 (1937); *Millette & Associates, Inc. v. Commissioner*, 594 F.2d 121, 124 (5th Cir.1979); *Cold Metal Process Co.*

*v. Commissioner*, 247 F.2d 864, 871 (6th Cir.1957).

A taxpayer may amortize intangible property when it has (1) an ascertainable value, and (2) a limited useful life. 26 U.S.C. § 167(a) [10]; 26 C.F.R. § 1.167(a)–3. [11] A taxpayer may not amortize intangible property which does not have an ascertainable value because there is no base from which to compute the amortization deductions. *Dobson v. United States*, 551 F.Supp. 1152, 1155, 1 Cl.Ct. 11 (1982); *Forward Communications Corp. v. United States*, 608 F.2d 485, 492, 221 Ct.Cl. 582 (1979); *First Northwest Industries of America v. Commissioner*, 70 T.C. 817 (1978) *rev'd on other grnds.* 649 F.2d 707 (9th Cir.1981). The taxpayer has the burden of proving how long of a limited useful life the property has; if he does not sustain the burden, he may not amortize the property. *Laird v. United States*, 556 F.2d 1224, 1236 (5th Cir.1977); *First Northwest Industries, supra; Dobson, supra*, 551 F.Supp. at 1155.

## III.

Plaintiff's reliance on the assignment of income doctrine is misplaced. The doctrine does not apply to the sale of the Yankee franchise and its attendant broadcasting contracts because NYY Inc. conveyed its entire interest in the franchise and the contracts to the Partnership.

expiration of such sixty (60) day period, if NYY and Station have not agreed upon such terms and conditions, both NYY and Station shall furnish the other in writing the terms and conditions (the "NYY Offer" and "Station Offer," respectively) most favorable to the party receiving each such Offer with respect to which each party is willing to agree to such extension. NYY may thereafter make any agreement for the telecast of NYY games with another television station located in the Home Territory upon terms and conditions at least as favorable to that station as the NYY offer but not as favorable as the Station Offer without reoffering such terms and conditions to Station.

10. Section 167(a) provides:
There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reason-

able allowance for obsolescence)—(1) of property used in trade or business, or (2) of property held for the production of income.

11. Regulation 1.167(a)–3 provides, in pertinent part:
If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance wil be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

*Blair, supra,* 300 U.S. at 14, 57 S.Ct. at 334; *Cold Metal, supra,* 247 F.2d at 871; *Millette, supra,* 594 F.2d at 124.

■ *The Network Broadcasting Contract.* Plaintiffs may not amortize the network broadcasting contract. It has neither an ascertainable value nor a limited useful life.

The Partnership purchased the rights of NYY Inc. under the Major League Agreement, including the right to a pro rata share of the profit from the network broadcasting contract. NYY Inc. could not have sold the right to this profit as an asset separate from the Major League Agreement because only the Commissioner or some other party to the Agreement could enforce the national broadcasting contract. Although NYY Inc. was not a *named* party to the network broadcasting contract—only the Commissioner and NBC were—NYY Inc., however, was a disclosed principal on behalf of which the Commissioner contracted. What the Partnership purchased from NYY Inc. was the right to be a disclosed principal. Thus, the national broadcasting contract has no value apart from the Major League Agreement because the right to a pro rata share of the profit from the network broadcasting contract is inherent in and inseverable from the Major League Agreement.

Moreover, the Major League Agreement does not have an ascertainable value apart from the Yankee franchise. A party could assign its rights under the Agreement only to the entity which purchased its franchise. The Agreement provides that its "terms and provisions . . . will be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto *as members of their respective Leagues.*" The emphasized language limits the category of "successors and assigns;" it does not refer to the "parties." The Agreement defines the "parties" collectively as the "Clubs" and individually as a "Club." ¶ 1.(e). A Club is clearly a member of a League. Thus the phrase "as members of their respective Leagues" must refer to

"successors and assigns" unless it is to be construed as a redundancy.

The Partnership purchased the combined franchise and Major League Agreement rights, not the rights to the network broadcasting contract. The network broadcasting contract increases the value of the purchase but is not a separate property interest. Accordingly, plaintiffs may not amortize the network broadcasting contract.

Even if this court held that the Major League Agreement had an ascertainable value separate from the value of the franchise, the plaintiffs could not amortize it because it does not have a limited useful life. *Laird, supra* 556 F.2d at 1236 (5th Cir.1977); *First Northwest Industries, supra; Dobson, supra,* 551 F.Supp. at 1155. It provides for its automatic perpetual renewal unless four (4) clubs of either League affirmatively give notice to the Commissioner of its termination. No Club gave such notice. Since the plain terms of the Major League Agreement demonstrate the existence of no limited useful life, plaintiffs may not amortize it.

■ *The Local Television Broadcasting Contract and the Radio Broadcasting Contract.* Also, plaintiffs may not amortize the value of the local television broadcasting contract because it has no limited useful life. The Partnership purchased the rights of NYY Inc. under the local television broadcasting contract. Under the contract's terms, both the Partnership and WPIX promise to negotiate in good faith for the extension of the contract. Each promises to submit to the other its best offer for the continuation of the contract. Moreover, if these negotiations initially fail, the Partnership is bound to give WPIX the first option to enter into a new contract on the terms of WPIX's best offer before it may offer equally favorable terms to another station. The contract contemplates a continuing relationship. Consequently, it has no limited useful life on which to base amortization.

This court need not address extensively whether the radio broadcasting contract is amortizable. In their 1973 and 1974 Part-

nership Tax Returns, the plaintiffs do not claim that it had an ascertainable value and thus, may not take amortization deductions for it. Def.'s Exhs. D and E.

For the reasons stated above, the government's motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied.

IT IS SO ORDERED.