**Daniel R. McCARTHY, et al.,
Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America (IRS),
Defendant-Appellee.**

**No. 85–3922.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 10, 1986.

Decided Dec. 29, 1986.

Sheldon M. Sager, Edward A. Lebit, argued, McCarthy, Lebit, Crystal & Haiman Co., L.P.A., Cleveland, Ohio, for plaintiffs-appellants.

Michael L. Paup, Chief, Appellate Section, Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div./Dept. of Justice, Washington, D.C., Roger M. Olsen, Ann Belanger Durney, Raymond W. Hepper, argued, for defendant-appellee.

Before KENNEDY and NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Daniel R. and Patricia C. McCarthy appeal from the orders of the district court granting summary judgment in favor of the government in this action brought pursuant to 28 U.S.C. § 1346(a)(1) to recover income taxes assessed and collected by the Internal Revenue Service (IRS). Appellants argue that the IRS erroneously denied amortization deductions which they had taken in 1973 and 1974 with respect to television broadcasting contracts acquired in a purchase of the New York Yankees baseball franchise, and legal and accounting fees incurred in relation to that purchase.

## I.

On March 22, 1973, an Ohio limited partnership entitled the New York Yankees Partnership (Partnership) purchased the New York Yankees professional baseball franchise (Yankees) from the New York Yankees, Inc. (NYY Inc.). Pursuant to the purchase agreement, the Partnership acquired:

(1.)(a) [A]ll of the properties and assets of NYY of every kind, nature and description, tangible and intangible, ... and described as including ...:

\*    \*    \*    \*    \*    \*

(v) All contract rights and other assets of NYY, including, without limitation:

\*    \*    \*    \*    \*    \*

(2) player contracts and player bonuses,

\*    \*    \*    \*    \*    \*

(4) ... radio and television broadcasting contracts,

\*    \*    \*    \*    \*    \*

(9) the goodwill of NYY's businesses, and

(10) all rights of NYY to use the name "New York Yankees" and any name including the term "Yankees".

In purchasing the Yankees, the Partnership paid NYY Inc. $10,000,000 and assumed $1,523,121 in liabilities and obligations.

Included among the inherent rights acquired with the purchase of the Yankee franchise was the right to broadcast Yankee games. The following three specific broadcasting contracts existed at the time of the purchase and were acquired by the Partnership: (1) a network contract between the National Broadcasting Company (NBC) and the Commissioner of Major League Baseball (Commissioner); (2) a local television broadcasting contract between WPIX, a New York City television station, and NYY Inc.; and (3) a local radio contract between Straus Broadcasting Group, Inc. and NYY Inc.

The network broadcasting contract granted NBC the exclusive right to televise nationally the Game of the Week, the League Championship playoffs, the All-Star Game, and the World Series for the 1972 through 1975 baseball seasons. Thus, three years remained on the contract when the Partnership purchased the Yankees in 1973. The network contract was entered into by the Commissioner on behalf of all Major League baseball franchises. The Commissioner derived his authority to execute the contract from the Major League Agreement In Re Major Leagues Central Fund (Major League Agreement), an agreement between all Major League baseball franchises.[1] The Major League Agreement empowered the Commissioner to pool together and sell as a unit the franchises' worldwide broadcasting rights. Proceeds from the sales of those rights were payable to the Commissioner as agent for the franchises; in turn, the Commissioner was obligated to credit each of the franchises with a pro rata share of the net proceeds. Thus, according to the terms of the Agreement, the Yankees were entitled to receive a pro rata share of the proceeds of the network broadcasting contract. These terms of the Major League Agreement were also binding upon the successors and assigns of the

---

1. The Major League baseball franchises first entered into the Major League Agreement on December 1, 1961, and amended it on several occasions, including December 1, 1972. The 1972 amendments were in force at the time the partnership purchased the Yankees.

baseball franchises.[2] The Partnership therefore was bound by, and was entitled to the benefits from, the Major League Agreement when it purchased the Yankees. Finally, the Major League Agreement was subject to automatic, perpetual renewal "unless and until any four (4) Clubs of the National League and any four (4) Clubs of the American League shall have given to the Commissioner written notice at least eighteen (18) months before the beginning of any [renewal] period of their intention to terminate [the] Agreement." Consequently, the franchises contemplated the execution of future network broadcasting contracts similar to the NBC contract.

The local television broadcasting contract granted WPIX the exclusive right to televise Yankee games in the New York City area. According to its terms, the contract was to "remain in force for the 1972, 1973 and 1974 seasons." Thus, two years remained on the contract when the Partnership purchased the Yankees. However, the contract also provided that the parties would negotiate an extension during the final 60 days of the 1974 season.[3] As to the terms of the contract, WPIX and NYY Inc. had agreed to divide the net receipts from advertising and licensing of other broadcasts.

The final broadcasting contract, the local radio contract with Straus, obligated Straus to broadcast on its New York City radio station all regular season games of the Yankees. Under the contract, NYY Inc. retained all property rights to the radio broadcasts and agreed to pay Straus a

calculated portion of the revenues which it generated through the sale of advertising. The contract's term ran through 1974.

The Partnership incurred substantial legal and accounting fees in acquiring the Yankees. According to the Partnership, $66,605 in professional fees were incurred in organizing the Partnership part of which were not billed until 1974. Further, the Partnership claimed that $42,687 in legal fees were incurred in obtaining financing for the acquisition, a $6,000,000 loan with a term of six years.

In 1973 and 1974, the Partnership claimed amortization deductions for the broadcasting contracts and the professional fees. The Partnership claimed that the broadcasting contracts had a total value of $1,047,254, representing the present value of the future expected revenues for the remaining terms of the contracts. The Partnership assigned a value of $967,464 and a useful life of three years to the network broadcasting contract; it gave the local television contract a value of $79,790 with a two-year useful life. Based on these valuations and useful lives, the Partnership claimed a total amortization deduction of $362,384 for each of the two years in question. With regard to the professional fees, the Partnership amortized the fees incurred in organizing the Partnership over a thirty year-period—the alleged life of the Partnership. The Partnership amortized the fees incident to financing, $42,687, over the six-year life of the loan. Consequently, the Partnership claimed total amortization

2. The pertinent clause provided:
The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto as members of their respective Leagues.
3. The applicable provision of the contract stated in part:
NYY shall conduct first negotiations with Station during the sixty (60) day period commencing August 1, 1974 in an attempt to reach agreement upon terms applicable for the extension of this Agreement. During such period, Station and NYY shall endeavor to reach mutual agreement upon such terms as will be applicable for such extension. Imme-

diately upon the expiration of such sixty (60) day period, if NYY and Station have not agreed upon such terms and conditions, both NYY and Station shall furnish the other in writing the terms and conditions (the "NYY Offer" and "Station Offer" respectively) most favorable to the party receiving each such Offer with respect to which each party is willing to agree to such extension. NYY may thereafter make any agreement for the telecast of NYY games with another television station located in the Home Territory upon terms and conditions at least as favorable to that station as the NYY Offer but not as favorable as the Station Offer without re-offering such terms and conditions to Station.

deductions relating to professional fees of $7,060 and $9,714 for the 1973 and 1974 tax years, respectively.

Daniel McCarthy owns a three percent interest in the Partnership and therefore included a pro rata share of the Partnership's gains or losses on his individual tax returns. *See* 26 U.S.C. § 701. Accordingly, in joint returns filed in 1973 and 1974, McCarthy took his allocable share of the amortization deductions claimed by the Partnership.[4] The Internal Revenue Service (IRS) denied the amortization deductions and assessed deficiencies against the McCarthys. They paid the deficiencies and filed claims for refunds, which the IRS denied.

On November 6, 1978, the McCarthys filed the instant action invoking jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).[5] The McCarthys claimed that the IRS improperly denied the amortization deductions taken for the professional fees and the broadcasting contracts. The McCarthys and the government filed cross-motions for partial summary judgment on each of the two amortization issues.

On May 15, 1985, the district court filed an order granting the government's motion for summary judgment on the issue of the amortizability of the professional fees. In its memorandum opinion filed the same day, the court concluded that the fees were incurred in acquiring a capital asset, the Yankee franchise, and as such were nondeductible capital expenditures which had to be added to the adjusted basis of the franchise and could only be used "to compute gain or loss upon the subsequent sale of the franchise." *McCarthy v. United States*, 613 F.Supp. 67, 69 (N.D.Ohio 1985).

On October 8, 1985, the district court filed another order, granting the government's motion for summary judgment on

the issue of amortization of the current broadcasting contracts. In its memorandum opinion filed the same day, the court held that those contracts, allegedly representing the current value to the franchise of its right to broadcast games, could not be amortized because they either had no separate ascertainable value or did not have a limited useful life. *McCarthy v. United States*, 622 F.Supp. 595 (N.D.Ohio 1985).

The court first found that the network broadcasting contract did not have an ascertainable value separate from the franchise. The court's reasoning began with the premise that since only the Commissioner could enforce the terms of the network contract, an individual franchise could not sell its right to share in the contract's proceeds as an asset separate from the franchise or the Major League Agreement. *Id.* at 600. Having deemed that the right to share in the profits from the network contract was "inseverable" from the Major League Agreement, the court then concluded that the network contract had no value apart from the Major League Agreement. *Id.* The court further found that the Major League Agreement had no value apart from the franchise because a franchise owner "could assign [the franchise's] rights under the Agreement only to the entity which purchased the franchise." *Id.* Thus, the court concluded:

> The Partnership purchased the combined franchise and Major League Agreement rights, not the rights to the network broadcasting contract. The network broadcasting contract increases the value of the purchase but is not a separate property interest.

*Id.*

Alternatively, the court stated that even if it believed that the Major League Agree-

---

**4.** Since Patricia C. McCarthy filed joint returns with her husband, she is a party to this suit to recover taxes.

**5.** Section 1346(a)(1) provides:
(a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws....

ment had a separate ascertainable value, it would still hold that the Agreement could not be amortized because it "does not have a limited useful life." *Id.* The court observed that the Agreement's own terms provided for perpetual renewal, thereby precluding a determination of a definite, limited life. *Id.* Because the court viewed the network contract as inseverable from the Major League Agreement, the necessary implication of its conclusion that the Agreement did not have a limited life was that the network contract also had no limited life.

With regard to the local television broadcasting contract, the court found that it, too, did not have a limited useful life and therefore could not be amortized. The court observed that pursuant to the contract, the parties contemplated a continuing relationship. *Id.* The court did not address whether the local radio contract was amortizable since the Partnership had not claimed that it had any amortizable value. *Id.* at 600–01.

In the instant appeal, the appellants challenge both of the orders of the district court.

## II.

### A. Broadcasting Contracts

■ We first address the issue of whether the network broadcasting contract and the local television contract were depreciable assets which could be amortized over their duration. The Internal Revenue Code permits a reasonable depreciation or amortization deduction for the "exhaustion, wear and tear" of property used in a trade or business or held for the production of income. 26 U.S.C. § 167(a). In order to be depreciable, the property must be an "inherently wasting asset," but it does not necessarily have to be tangible property. *Griswold v. Commissioner,* 400 F.2d 427, 433 (5th Cir.1968). Although § 167(a) does not expressly provide that intangible property may, under appropriate circumstances, be depreciable, it is well-settled that the depreciation deduction authorized in § 167(a) applies to intangibles. *Theophelis*

*v. United States,* 751 F.2d 165, 167 (6th Cir.1984). Treasury Regulation § 1.167(a)–3 expressly provides:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. *An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation.* No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. . . .

26 C.F.R. § 1.167(a)–3 (emphasis added). Thus in order to be depreciable or amortizable as a "wasting asset," intangible property must have: (1) an ascertainable value separate from goodwill; and (2) a limited useful life ascertainable with reasonable accuracy. *See Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1250 (5th Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974). The burden of proving that an intangible asset has these characteristics is on the taxpayer. *Id.* Therefore, in order for the appellants to establish that they could amortize the broadcasting rights of the Yankee franchise, represented by the current broadcasting contracts, as a "wasting asset," they must prove that the broadcasting rights have both ascertainable values apart from the franchise and limited useful lives.

The appellants characterize the broadcasting rights acquired by the Partnership in the purchase of the Yankees as being comprised of two components: current broadcasting rights, represented by the broadcasting contracts existing at the time of the purchase, and future broadcasting rights inherent in the franchise which had yet to be contracted when the purchase was made. As noted previously, the Part-

nership valued the current broadcasting rights at $1,047,254, which was the present value of the expected revenues from the existing broadcasting contracts. The Partnership placed a value of $1,951,347 on the Yankee franchise and the general rights inherent in it. The Partnership alleged that an undetermined portion of this amount was attributable to future broadcasting rights. The appellants rely on these valuations to support their claim that the current broadcasting rights had an ascertainable value. Furthermore, the appellants contend that the current broadcasting rights had a limited useful life, represented by the unexpired terms of the existing contracts. By the terms of the agreements, three years remained on the network contract and two years remained on the local television contract at the time of the acquisition.[6] The appellants contend that those periods constitute limited useful lives which are ascertainable with reasonable accuracy. The appellants therefore conclude that since the current broadcasting contracts had ascertainable values and would expire after a definite limited period, they were wasting assets subject to amortization.

We find it unnecessary to determine whether the broadcasting rights had an ascertainable value apart from the franchise,[7] because we conclude that the rights did not have a limited useful life which could be ascertained with reasonable accuracy and therefore could not be amortized as a wasting asset. In examining the "useful life" issue we find persuasive the Fifth Circuit's analysis and decision in a similar case, *Laird v. United States*, 556 F.2d 1224 (5th Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 158 (1978).

*Laird*, like the present case, was a suit for refund of federal income taxes and involved the tax treatment of the purchase of the Atlanta Falcons professional football franchise. One of the questions presented in *Laird* was whether the purchaser of the Falcons was entitled to amortize its ratable share of the revenues produced by a four-year contract executed by the Commissioner of the National Football League (NFL) and the CBS Television Network under which CBS received the right to televise the NFL's games. As in the present case, the NFL franchises had agreed to bargain collectively for the sale of their television rights and to share ratably in the income produced by such a sale. *Id.* at 1229. Faced with these facts, the Fifth Circuit first observed that the franchise owner's television rights were, by agreement, to continue as long as the Falcons remained a member of the NFL; that is, the television rights were inherent in the franchise. The court then rejected the taxpayers' contention that the right to revenue under the four-year CBS contract constituted a separate asset from the franchise's future, uncontracted television rights, which was amortizable over the duration of the contract. The taxpayers had argued that the contract was a wasting asset, and therefore amortizable, because it had a proven value—the present value of the guaranteed future income under the contract—and a limited useful life—the four-year term of the contract. The court adopted the government's "link in a perpetual chain" theory in rejecting the taxpayers' argument, stating:

> [A]s the Government correctly points out, the rights under the CBS contract were only a "four-year link" in a "perpetual chain" of television income. Though the existing contract provided a measure of [the purchaser's] television rights over a particular four-year period, nevertheless the rights were to continue indefinitely.... Because the rights pursuant to the CBS contract were only a link in a

---

**6.** We need not examine the term remaining on the local radio contract since, as the district court observed, neither the Partnership nor the appellants sought to amortize that contract.

**7.** Since we are not reviewing the issue of valuation, we render no opinion on the propriety of the district court's holding that the broadcasting contracts could not be valued separately from the franchise, nor do we make any judgment as to the court's analysis in reaching that conclusion.

chain of revenue which would continue as long as the Atlanta Club holds an NFL franchise, they did not constitute a wasting asset. . . .

*Id.* at 1236–37 (footnote omitted). Based on this analysis, the court concluded that it was "clear that the unlimited life of the television rights defeats any attempt to amortize the income received under the CBS contract." *Id.* at 1237.

The Tax Court reached the same conclusion, utilizing the same, albeit abbreviated, analysis, in *First Northwest Industries v. Commissioner*, 70 T.C. 817 (1978), *rev'd on other grounds*, 649 F.2d 707 (9th Cir.1981). *First Northwest* involved the tax treatment of the purchase of the Seattle Supersonics, a National Basketball Association franchise. Included among the rights acquired in that purchase was the right to an equal share of all revenues from national broadcasting of NBA games. At the time of the purchase, a contract existed between the NBA and the American Broadcasting Company (ABC) granting ABC exclusive worldwide television broadcasting rights. In response to the claim that the current broadcasting contract was a wasting, and therefore amortizable, asset, the Tax Court held that the contract was nonamortizable because it merely represented a "link in a continuing chain of national television income" which would continue as long as the Supersonics remained a member of the NBA. 70 T.C. at 861.

In the instant case, the current broadcasting contracts likewise are merely links in a perpetual chain of broadcasting revenues. For example, the network broadcasting contract was executed pursuant to the Major League Agreement. The Major League Agreement, by which all the Major League baseball franchises agreed to share equally in the revenues of national broadcasting contracts, is subject to perpetual renewal. Consequently, as long as the Yankees remain a Major League baseball franchise, the club will have the right to share in the revenues produced by national broadcasting contracts. Upon expiration of each such contract a new contract pro-

viding further revenues, will be executed. Thus, the NBC contract executed in 1973 was merely a link in a perpetual chain of national broadcasting contracts, each of which will provide revenue to the Yankees. We conclude from this that even though the 1973 network broadcasting contract covered a distinct ascertainable period, the asset represented by the contract—each franchise's national broadcasting rights—did not have a limited useful life and therefore cannot be considered to be a wasting asset.

The same holds true for the local television contract. The Yankees' right to contract for local televising of games is a right inherent in the franchise. That right therefore has a limitless life coextensive with the life of the franchise. The WPIX agreement constituted only one of what certainly will be many local television contracts. Thus, the agreement only represented a small portion of the asset in question—the franchise's right to televise its games locally—and did not represent a separate asset with a limited useful life. Furthermore, as shown by the renegotiation terms of the WPIX agreement, the parties contemplated a continuing relationship, rather than a relationship which would terminate after a defined period. Consequently, the contract by its own terms did not have a limited useful life which could be ascertained with reasonable accuracy. We therefore conclude that the local television contract, like the network broadcasting contract, cannot be amortized.

As a final comment on this issue, we believe that disallowing amortization of the broadcasting contracts is fully consistent with the premise that only wasting assets may be amortized. The appellants theorize that the broadcasting contracts were amortizable because at the expiration of their terms they had no more value to the franchise. While this is true, the asset represented by the contracts, the right to broadcast games nationally and locally, was still extremely valuable to the franchise at the expiration of the contracts. That asset simply is not a wasting asset in the sense

that at the end of a definite period, it will be worthless to the franchise. Accordingly, the broadcasting contracts are readily distinguishable from player contracts.

Both the appellants and the Commissioner in his *amicus* brief observe that the courts have consistently permitted amortization of professional athletes' contracts acquired in a purchase of a professional sports franchise. *See Laird*, 556 F.2d at 1237–42 (professional football players' contracts amortizable); *Selig v. United States*, 740 F.2d 572, 577–80 (7th Cir.1984) (professional baseball players' contracts amortizable). The appellants and the Commissioner contend that player contracts are analogous to the broadcasting contracts because when they lapse after a definite term, new player contracts are always executed. This observation is the premise of the parties' contention that the "link in a perpetual chain" theory is unsound and should not be applied in the instant case.

In making this argument, the appellants and the Commissioner ignore a very significant distinction between the two types of contracts. When a player contract expires, the franchise which was a party to the contract no longer has an asset with any value. The asset represented by the contract, the player's agreement to play for the franchise, no longer exists. Accordingly, the asset "wasted" over the period of the contract. The only way the franchise can reacquire the asset is to recontract with the player, committing itself to pay additional amounts to the player in return for the player's services. In short, the franchise must invest additional capital to retain the asset. Broadcasting contracts are very different. At the expiration of those contracts, the franchise still retains the very valuable asset of the right to broadcast its games. It need not reinvest in order to retain this asset. Thus, the asset does not "waste away" during the term of any specific broadcasting contract. While a franchise will certainly become a

party to a new broadcasting contract at the expiration of each preceeding contract, it does not do so in order to reacquire an asset; rather, it does so in order to obtain revenues for an existing asset.

In sum, we find that the IRS properly denied the appellants' amortization deductions for the broadcasting contracts. Because the broadcasting rights of the Yankees do not have a limited life and do not represent a wasting asset, the appellants could not amortize pursuant to Treas.Reg. § 1.167(a)–3 the revenues received from the broadcasting contracts over the terms of those contracts. Accordingly, we affirm the order of the district court granting summary judgment in favor of the government on this issue.

## B. Professional Fees

The professional fees incurred by the Partnership can be broken down into two categories: the legal fees incurred in obtaining the $6,000,000 six-year loan for the purchase of the Yankees, and the accounting and legal fees incurred in organizing the Partnership.

The government concedes before this court that $31,000 in fees incurred in obtaining the loan are amortizable over the six-year life of the loan.[8] Apparently, the government conceded as much at the district court level, disputing only the appellants' amortization of the fees associated with organizing the Partnership, but the district court failed to take cognizance of this point. Accordingly, we find it necessary to remand this issue to the district court with instructions to grant a partial refund to the appellants representing their pro rata share of an amortization deduction for the $31,000 in fees for the tax years 1973 and 1974.

With respect to the fees incurred in organizing the Partnership, the appellants claim that those fees are amortizable over a thirty-year period. Article V of the Partnership Agreement provides that the term of

---

**8.** Although the appellants originally argued that the Partnership incurred $42,687 in legal fees in connection with the loan, they no longer assert

this amount as the amortization basis; rather, they accept the $31,000 amount conceded by the government.

the Partnership, which began in 1973, is to "continue until December 31, 2002, subject to (i) the extension thereof to any fixed date, or subsequent thereto by unanimous agreement of the Partners or (ii) the earlier dissolution thereof pursuant to this Agreement." Based on this provision and the proof presented as to the amount of the fees, the appellants urge that the two elements of amortization, ascertainable cost basis and a limited useful life, are met and therefore conclude that the fees are amortizable.[9]

■ We reject this claim on the same basis relied on by the district court; that is, that the fees cannot be amortized because they were incurred as part of the purchase of an ongoing business, the New York Yankees, and as such are capital expenditures which must be added to the cost basis of the Yankees.[10] The Supreme Court has described the tax treatment for capital expenditures as follows:

> Since the inception of the present federal income tax in 1913, capital expenditures have not been deductible. See Internal Revenue Code of 1954, § 263. Such expenditures are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the

asset is sold. If an expense is capital, it cannot be deducted as "ordinary and necessary". . . .

*Woodward v. Commissioner,* 397 U.S. 572, 574–75, 90 S.Ct. 1302, 1304, 25 L.Ed.2d 577 (1970) (footnote omitted). With respect to professional fees incurred in connection with the acquisition of property, this Circuit follows the general rule that such fees are ordinarily capital expenditures and are subject to the above-described treatment ordinarily afforded capital expenditures; that is, they must be added to the cost basis of such property and used only to calculate gain or loss when the property is ultimately disposed. *See Lanrao, Inc. v. United States,* 422 F.2d 481, 484 (6th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1816, 26 L.Ed.2d 89 (1970).

It is undisputable that the Partnership was formed for the sole purpose of acquiring and operating the Yankees franchise. Article IV of the Partnership agreement expressly states that the "purposes of the Partnership shall be to acquire, maintain, operate and control the New York Yankees Baseball Club." Thus, the expenses involved in organizing the Partnership were incurred as a necessary ingredient of the purchase price of the Yankees. As such, they are properly considered capital expenditures incurred in the acquisition of the Yankees which must be added to the

---

9. It appears that had these professional fees been incurred after December 31, 1976, there would be no dispute that they would be amortizable. As the government notes, 26 U.S.C. § 709(b) permits amortization of partnership organizational expenditures. Section 709(b) states:

> (b) *Amortization of organization fees.—*
> (1) *Deduction*—Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60–month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165.

> (2) *Organizational expenses defined.* —The organizational expenses to which paragraph (1) applies, are expenditures which—
> (A) are incident to the creation of the partnership;
> (B) are chargeable to capital account; and
> (C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life.

However, § 709(b) applies only to "amounts paid or incurred in taxable years beginning after December 31, 1976." Tax Reform Act of 1976, Pub.L. No. 94–455, § 213(f)(3), 90 Stat. 1520, 1549.

10. Since this conclusion sufficiently resolves the issue of amortization, we decline to consider the government's alternative argument that the organizational expenses cannot be amortized because the Partnership has an indeterminate, rather than limited, useful life.

basis of the Yankees rather than amortized over the alleged life of the Partnership.[11] We therefore affirm the portion of the district court's order granting summary judgment for the government on the issue of amortization of the organizational expenses.

Accordingly, for the reasons set forth above, we AFFIRM in part and VACATE in part the judgment of the district court and REMAND with instructions to award partial summary judgment to the appellants on the issue of the amortizability of the legal fees incurred in obtaining financing for the Yankees acquisition.

---

**11.** This is, in effect, an application of the step transaction doctrine. "Under the doctrine, individual steps in a series of transactions are considered 'together as component parts of an overall plan,' and taxation turns on the transaction viewed as a whole rather than the individual steps." *Brown v. United States,* 782 F.2d 559, 563 (6th Cir.1986), *quoting Crenshaw v. United States,* 450 F.2d 472, 475–76 (5th Cir.1971).